**WILLIAM FIRTH CO. et al. v. SOUTH CAROLINA LOAN & TRUST CO.**

**In re GOLDVILLE MFG. CO.**

(Circuit Court of Appeals, Fourth Circuit.  May 5, 1903.)

No. 481.

1. CORPORATIONS—VALIDITY OF BONDS.
    Bonds executed by a corporation for the declared purpose of selling the same to provide means to carry out the objects for which the corporation was organized are not invalid because instead of being sold they were pledged to secure loans the proceeds of which were used in good

---

¶ 1. See Corporations, vol. 12, Cent. Dig. § 1837.

faith for corporate purposes, or as security for purchases made for the same purposes.

**2. SAME—INFORMALITIES IN STOCKHOLDERS' MEETING.**

General creditors of a corporation cannot impeach the validity of bonds issued by it on account of informalities in the meeting of the stockholders which authorized their issuance, where all stockholders were present and voted in favor of the action taken.

**3. MORTGAGES—VALIDITY—DELIVERY.**

A mortgage by a corporation to secure bonds was duly signed and sealed, and was then taken by the attorney for the corporation to the trustee named therein, which executed its acceptance in the presence of two witnesses, after which it was redelivered to the attorney to be recorded, and was so recorded, but was subsequently lost, not having been returned to the trustee. *Held*, that there was a sufficient delivery, under the law of South Carolina, to render the mortgage valid.

**4. CORPORATIONS—VALIDITY OF BONDS PLEDGED—CONSTITUTIONAL RESTRICTIONS.**

Const. S. C. art. 9, § 10, which prohibits the issuance of stock or bonds by a corporation "save for labor done or money or property actually received or subscribed," does not render invalid bonds of a corporation pledged by it as security for money borrowed and used in the purchase of machinery necessary in its business, although the face value of the bonds may be greater than the sums borrowed.

**5. SAME.**

Where machinery for a manufacturing plant had been contracted for by a partnership, which afterward transferred its property to a corporation organized for the purpose, and the corporation assumed the contracts, with the consent of the creditors, and executed its notes for the machinery, secured by a pledge of its bonds, the indebtedness of the corporation did not arise until the novation, and the bonds were not pledged for an antecedent indebtedness.

**6. FIXTURES — AS BETWEEN MORTGAGOR AND MORTGAGEE — COTTON MILL MACHINERY.**

Under the statute of South Carolina requiring separate records to be kept of chattel mortgages and mortgages of real property, a mortgage covering a cotton mill and the machinery therein is valid as to such machinery although recorded only in the record for real estate mortgages. The machinery being necessary to the use of the building for the purpose to which it was devoted, both together constitute the mill; and it must be presumed to have been the intention of both parties that the machinery should be a fixture and a part of the realty, regardless of the manner of attachment.

Appeal from the District Court of the United States for the District of South Carolina, in Bankruptcy.

For opinion below, see 118 Fed. 892.

There was in the county of Laurens, in the state of South Carolina, a mercantile firm composed of J. S. Blalock and L. W. C. Blalock, father and son, doing business under the name of the Goldville Manufacturing Company. In 1900 the firm enlarged its business, erected cotton gins and cotton oil machinery, and contemplated erecting a cotton mill. These gins and cotton oil machinery were upon a tract of land owned by the copartners. The cotton mill was to be erected on the same land. Carrying out the scheme of a cotton mill, they placed orders for machinery with many parties. After this was done it was deemed best to form a corporation. To this end application was made to the Secretary of State, under the provisions of the act of Assembly in that behalf made, and a charter was issued to the Goldville Manufacturing Company of Goldville, S. C., on the 23d October, 1900. The capital stock of the corporation was fixed at $100,000, books of subscription were opened, and the whole stock subscribed for by L. W. C. Blalock, M. E. Browning, and J. S. Blalock, on the 22d October, 1900. The stock was paid up in full in property. On the 24th October, 1900, at a meeting of the stock-

holders, it was resolved that a special meeting of the stockholders, as required by law, be called for the purpose of authorizing the issue of bonds to the amount of $100,000, secured by mortgage of all the property of the corporation. The declared purpose of the proposed issue was to provide the necessary means to complete the buildings, and to purchase machinery, looms, engines, boilers, implements, and tools, and to enable the directors to carry out the purpose for which the corporation was formed. These purposes are expressed in the charter as follows: "The general purpose of the corporation, and the nature of business it proposes to do, is to manufacture, spin, dye, print, finish, to make yarns, and sell all goods of any kind, made of cotton or wool, or of which cotton or wool, or other fibrous articles, may form a part, or any other article of any nature or kind whatsoever which they may from time to time desire, also the manufacture of cotton seed, cotton seed oil, hulls, linters, and all other cotton seed products, and to sell the same, and to make all machinery, tools, and implements necessary to or used for such purpose, and to erect such mill buildings, machine shops, stores, and all other works as may be required to carry on such branches of manufacture and business."

At the called meeting of the stockholders, by unanimous vote, an issue of bonds to the amount of $75,000 was authorized for the purposes indicated, and the South Carolina Loan & Trust Company was selected as trustee of the mortgage to be executed to secure these bonds. The bonds were prepared and a draft of the mortgage was made by W. H. Lyles, Esq., solicitor of the corporation. This draft was sent by Mr. Lyles from his residence in Columbia to Goldville, in South Carolina, by his clerk, and was returned to him signed by the Goldville Manufacturing Company, without the addition of the words, "of Goldville, South Carolina," and with two subscribing witnesses, sealed with the seal of the company. Consequently he and the secretary went to Charleston, delivered the deed to the president of the South Carolina Loan & Trust Company, and saw him and his cashier write upon it the acceptance of the trust. At the same time the bonds were to be delivered to the trustee. The mortgage covered two tracts of land, one of 1,365 acres and another contiguous of 190 acres, "together with all the buildings and improvements situated on said premises, consisting in part one cotton mill building, 280 by 75 feet, with boiler room 33x35 feet, and engine room 38x35 feet, attached; one 20-ton oil mill building; one ginnery building; 20 operatives' houses and other buildings; also all machinery, shafting, engines, boilers, tools, and appliances belonging to said mortgagor, and used in its cotton mill business, its cotton oil business, and its ginnery business, consisting in part of A. T. Atherton & Co.'s pickers and intermediates, Saco and Petee's cards, spoolers, and drawers, Providence spindles, Fales and Jenks twisters, Fall River spinning frames, Atlas engine and boilers, International sprinklers, General Electric Company's Dynamo Climax Engine, Cumberland Iron & Machine Company shafting and pulleys, belting, mill supplies, etc.; also one Cardwell Machine Company 20-ton cotton oil mill outfit, one Daniel Pratt Gin Company's ginnery outfit, consisting of three gins, one power press, and other articles, together with all and singular the rights, members, hereditaments, and appurtenances to the said premises belonging or in any wise incident or appertaining, and all and singular the corporate rights and franchises of the said the Goldville Manufacturing Company."

The mortgage, when thus executed, was sent by Mr. Lyles, attorney for the mortgagor, and lodged for record and deposited with the officer in Laurens county charged with the registration of deeds of conveyance and mortgages of real and personal property. It was recorded by him in a book set apart for recording mortgages of realty. He had in his office another book in which chattel mortgages were recorded. He did not record this mortgage in that book. When the resolutions were passed authorizing the issue of these bonds, they contained a resolution authorizing the president and treasurer to sell the bonds at not less than ——— cents on the dollar, and until sold these officers were authorized to pledge the bonds as collateral for notes of the company for the purpose of borrowing money upon the machinery, etc. Various efforts were made to sell the bonds, without avail, and they were then used as collateral. Ten thousand dollars were borrowed from the Charleston Savings

Institution, by note, upon 15 bonds, of $1,000 each, as collateral; $5,000 were borrowed from F. J. Peltzer, by note, with seven $1,000 bonds as collateral; $10,000 were borrowed from the People's National Bank, with thirteen $1,000 bonds as collateral; $5,000 were borrowed from the Bank of Charleston, N. B. A., by note, with six $1,000 bonds as collateral. Another loan of $5,000 was made with the People's National Bank, by note, with six $1,000 bonds as collateral; $4,654.58 were borrowed from the Bank of Columbia, by note, with five $1,000 bonds as collateral. All of the proceeds of these loans, except those from the Bank of Columbia, were applied to payment for machinery purchased and contracted for. The proceeds of the loan from the Bank of Columbia were used for the payment of freight on the machinery. The contracts for the machinery were made by the mercantile firm, the Goldville Manufacturing Company. They were not paid for when the corporation was formed. The corporation then purchased all the machinery, assuming the contracts thereupon with the assent of the creditors, who accepted the corporation as their debtor. All the remaining bonds were used as collateral security for machinery purchased from various companies and individuals. The original mortgage, after its record in the clerk's office of Laurens county, was lost, presumably in the mail. By stipulation of counsel the office copy was used in its stead. The office copy represents that it was signed and sealed for the corporation in the presence of two witnesses, one of whom proved the deed for record. · Acceptance by the trustee is also witnessed by two subscribing witnesses, one of whom proved the deed for record. The name of the corporation expressed in its charter is the Goldville Manufacturing Company of Goldville, S. C. The mortgage is signed in the name of the Goldville Manufacturing Company, without the concluding words, and the same designation, with the same omission, is used in the bonds.

Having erected its mill, the corporation went on in business and incurred numerous debts. It did not meet with success, and became greatly embarrassed. Proceedings were instituted in the state court by the trustee, praying foreclosure of the mortgage and the appointment of a receiver. Very soon thereafter proceedings were instituted in the District Court of the United States by the unsecured creditors, seeking to put the corporation into bankruptcy. After some negotiation, it was agreed that the corporation should be declared a bankrupt upon its own petition, and that all future proceedings should be conducted in the bankrupt court. C. C. Featherstone, Esq., was duly appointed trustee. Thereupon the South Carolina Loan & Trust Company, the People's National Bank of Charleston, the Charleston Bank, Charleston Savings Institution, F. J. Pelzer, and Saco & Petee Machine Shops filed their petition in the court below praying the foreclosure of the mortgage executed to secure the bonds held by them. Thereupon an order was entered requiring service of the petition on the bankrupt corporation, upon the trustee, Mr. Featherstone, and upon the creditors who had filed their petition in bankruptcy against the corporation, calling upon them to answer. This was done, other creditors holding bonds as collateral intervened, and the case was referred to a referee to take the testimony. The referee made his report, and the case came on to be heard upon the pleading and testimony. The court below entered a decree for foreclosure in accordance with an opinion filed in which there was a full and complete discussion of the law of the case. The unsecured creditors were allowed an appeal from this decree, and the case is here on 15 assignments of error.

S. J. Simpson (Simpson & Bomar, N. B. Dial, and Simpson & Cooper, on the briefs), for appellants.

W. C. Miller and Henry Buist (T. M. Mordecai, on the briefs), for appellee.

Before GOFF and SIMONTON, Circuit Judges, and WADDILL, District Judge.

SIMONTON, Circuit Judge (after stating the facts). The first assignment of error is that all the money received from the sale of the

bonds was not used for the purchase of machinery or other corporate purposes. Literally this is true. The record shows that no bonds were sold; that an effort was made to make sale of them, but this could not be effected, except at a large discount. The plan of borrowing the money on hypothecation was adopted, and all the money so obtained was devoted to paying for machinery contracted for. The bonds not so used were placed as security for other purchases of the same character. There is no suspicion of fraud in this transaction. The wisdom of this course cannot be questioned. Naturally and necessarily the bonds of a manufacturing corporation, just entering business, whose success and credit are not yet established, cannot command a ready sale and cannot be sold except at a large discount. Hypothecation prevents the sacrifice of the bonds, and gives every opportunity to try the future. If this be successful, the bonds can be realized in money·without loss. If unsuccessful, the loss will be not greater than such as would·occur if the bonds were forced on the market.

The second assignment of error presents the question: Was there such a formal and legal meeting of the stockholders as is required by law to be held before the mortgage could be given? The court below reviewed the testimony on this point, and answered this query in the affirmative. Upon examining the testimony, we fully concur with the court below. Even were there informalities, we would not lay any stress on them. All the formalities required to be used before bonds of corporations are issued are for the protection of stockholders. At every meeting held about this issue of bonds every stockholder was present, voting for and consenting to the issue.

The third assignment of error is that the mortgage was not delivered in the presence of two witnesses, as required by law, and therefore not legally executed. It was signed and sealed in the presence of two witnesses, was then carried to the trustee, who, on its receipt, executed its acceptance in the presence of two witnesses, so it was certainly delivered to the trustee, and as certainly was recorded. Hanrick v. Neely, 10 Wall. 364, 19 L. Ed. 947. The record also shows that when signed by the corporation it was delivered to an agent to be delivered to the trustee. The law of South Carolina on this point is finally settled. When a grantor parts with a deed at its execution it is a good delivery. A delivery to a trustee of a deed conveying property in trust is not necessary to pass the interest to the cestui que trust. A delivery to a third person for the trustee would be good until he dissent, and he would not be allowed to dissent to the injury of the cestui que trust. Dawson v. Dawson, Rice, Eq. (S. C.) 244; Cloud v. Calhoun, 10 Rich. Eq. (S. C.) 358; Ingram v. Porter, 4 McCord (S. C.) 198. So in Withers v. Jenkins, 6 S. C. 122, quoted by the court below:

"It is not necessary to the valid execution of a deed that there should be actual delivery either to the grantee in person, or to some one expressly authorized to accept it on his behalf, much less is such a requisition essential where the instrument gives a trust conferring on the trustee a mere naked title, coupled with no interest, that he holds for the mere purpose of protecting and preserving the trust for the beneficiaries who may be entitled to these enjoyments. If the grantor, in the absence of the grantee, and without his

knowledge, has actually consummated the delivery in accordance with the purpose declared on the face of the instrument, the object to be effected by it is as fully accomplished as if there had been an actual transfer of the paper from the hands of the grantor to those of the grantee."

These assignments of error are not well taken. An objection to the bonds and mortgage was taken below because they were not executed in the full name of the corporation. This objection is not pressed here; if it had been we would have reached the same conclusion as the court below did on this point, and would not have held it tenable. Morawetz on Corp. § 354.

The other assignments of error present the real questions in this case on the merits. They involve two distinct propositions: First, that the bonds and mortgage are invalid under the provisions of section 10, art. 9, of the Constitution of South Carolina; second, that so much of the mortgage as covers the machinery is null and void as to the unsecured creditors, because the deed was not recorded in the book provided for the recording of chattel mortgages.

Is the use made of these bonds in hypothecating them repugnant to section 10, art. 9, of the Constitution of South Carolina? This is the language of the Constitution:

"Sec. 10. Stocks or bonds shall not be issued by any corporation save for labor done or money or property actually received or subscribed; and all fictitious increase of stock or indebtedness shall be void."

The section assumes that a corporation may for lawful purposes and in a lawful way issue bonds. It is besides this settled that a corporation without special authority may dispose of land, goods, and chattels or of any interest in the same as it may deem expedient, and in the course of its legitimate business may make a bond, mortgage, note, or draft. White Water Valley Canal Co. v. Vallette, 21 How. 424, 16 L. Ed. 154; Railroad Co. v. Howard, 7 Wall. 413, 19 L. Ed. 117. The Constitution uses the word "issued." This term is broad enough to embrace the idea of pledge as well as that of sale. In contemplation of law, bonds pledged by a corporation are just as much issued as when they are sold. Atlantic Trust Co. v. Woodbridge [C. C.] 79 Fed. 842. As corporations issuing bonds may sell them bona fide below par, so in making a loan they may hypothecate bonds greater in nominal value than the amounts borrowed. The mere fact that the bonds were issued for more than the value of the notes thus secured does not of itself indicate fraud or create a fictitious indebtedness. Id. The Constitution of the state of Arkansas has a provision in every respect the same as that in the Constitution of the state of South Carolina, which is now under consideration. The Supreme Court of the United States, considering that provision in Memphis, etc., R. R. v. Dow, 120 U. S. 298, 7 Sup. Ct. 487, 30 L. Ed. 595, says:

"The prohibition against the issuing of stock or bonds, except for money or property actually received, or labor done, and against the fictitious increase of stock or indebtedness, was intended to protect stockholders against spoliation, and to guard the public against securities that were absolutely worthless. One of the mischiefs sought to be remedied is the flooding of the market with stock and bonds that do not represent anything whatever of substantial value. * * * The language of the Arkansas Constitution does not neces-

sarily indicate a purpose to make the validity of every issue of stock or bonds by a private corporation to depend upon the inquiry whether the money, property, or labor actually received therefor was of equal value in the market with the stock or bonds so issued.  It is not clear, from the words used, that the framers of that instrument intended to restrict private corporations, at least when acting with the approval of their stockholders, in the exchange of their stock or bonds for money, property or labor, upon such terms as they deem proper; provided, always, the transaction is a real one, based upon a present consideration, and having reference to legitimate corporate purposes, and is not a mere device to evade the law and accomplish that which is forbidden."

Apply the tests of this decision to the case at bar.  The property of the company was valued at $100,000.  No exception has been taken to this.  The amount of bonds issued was $75,000.  So these bonds cannot be said not to represent substantial value.  So, also, each transaction was a real one.  Money was received on every pledge.  It was based on a present consideration, the actual receipt of the money.  The contract in each case had reference to a legitimate corporate purpose, obtaining the means by the pledge to complete the purchase of machinery for the purposes of the corporation.  The money obtained on each transaction was actually used for this same purpose.  There was here no device to evade the law or to accomplish that which is forbidden.  It is contended, however, that, whilst this may be the law as to the disposition of bonds for an immediate consideration, the use of bonds for the payment of an antecedent debt is unlawful.  If we were to assume that this was the case here, we would be inclined to adopt the views of the Supreme Court of Alabama expressed in Nelson v. Hubbard, 96 Ala. 238, 11 South. 428, 17 L. R. A. 375, as follows:

"Issues of stock and bonds have been sustained under constitutional and statutory provisions of the same import as the one under consideration [of the same tenor as those which we are now discussing] when they were disposed of for the best price that could be obtained, though for considerably less than their face value.  *  *  *  The power to borrow money, and to mortgage or otherwise convey or pledge its property, real or personal, and its franchises, to secure the payment of the money so borrowed, or any other debt contracted by it, includes the power to pledge the bonds of a corporation, secured by its mortgage on property, as collateral security for debts of the corporation presently created or already owing.  And we do not think that such pledge, if made without fraud, and solely for the bona fide purpose of satisfactorily securing the payment of corporate debts, can properly be regarded as effecting a fictitious increase of indebtedness, or as not issued for money, labor done, or money or property actually received, though the amount of the bonds exceeds the amount of the indebtedness to be secured."

But the bonds were not used as charged.  The objection of the appellants goes to bonds pledged to the petitioners in this case, the proceeds of which were used to pay the freight on machinery, and those pledged for the claims of Saco & Petee Machine Shops, the Atlas Engine Works, and of the Bodified Belting Company, contending that these claims were contracted, in whole or in part, not only before the pledge of the bonds, but before their existence.

As has been seen, the Blalocks first formed a business copartnership which possessed certain cotton oil and gin machinery, and that they contemplated erecting a cotton mill and engaging in the business of manufacturing cotton.  To further this last-named purpose, they

contracted for the purchase of cotton mill machinery to be furnished by the Atlas Engine Works, Saco & Petee Machine Shops, and the Bodified Belting Company. After this the corporation was formed, and in their subscription to the capital stock property was used, but in that property was included no part of the cotton oil and ginnery plant, nor any part of the machinery so contracted for. When the corporation was formed it contracted with the Blalocks to take off their hands all the machinery so contracted for—a perfectly legitimate transaction. Twin-Lick Oil Co. v. Marbury, 91 U. S. 589, 23 L. Ed. 328. In other words, it purchased this machinery from the Blalocks, and the consideration for the purchase was the assumption of the cost, substituting the obligation of the corporation for that of the Blalocks, with the consent of the creditors of the Blalocks. "Such a novation of debtors could not take place without the consent of the creditor. Such a contract could not become a debt of the company until the company's obligation was accepted by the creditor, as between the creditor and the new debtor. The company owed nothing for the machinery nor for the freight until its assumption of these debts, and such assumption and acquiescence by the creditor constituted the first contract made by the company for the machinery and the freight. The evidence of that contract is in the notes of the company for the machinery to the companies named above, and for the freight upon the machinery to the railroad company, accompanied by a pledge of the bonds as collateral therefor. The pledge was contemporaneous with the creation of the relation of debtor and creditor between the company and the several creditors named in the exceptions. It is not the case of the company executing their notes and pledging their bonds for an antecedent debt, but a case of a pledge of bonds upon a present consideration." The money derived from the Bank of Columbia, used in paying the railroad company for freight on the machinery, was a part of the cost of the machinery. So the pledged bonds to the manufacturers and the bonds used for paying freight were used for and applied to a present debt assumed by the company, and from its standpoint none of them were antecedent debts, because until such assumption they were in no way debts of the corporation.

The next and the more grave question is as to the manner in which the mortgage was recorded. The appellants insist that this mortgage embraced both real and personal property; that by the law of South Carolina mortgages of real property are recorded in one set of books used solely for this purpose, and that mortgages of personal property are recorded in a wholly distinct and separate set of books; that this deed was recorded only in the book set apart for real property, and was never recorded in the book provided for personal property. So far, therefore, as the machinery was concerned, it is null and void as to subsequent creditors, the machinery always retaining the character of personal property.

The statute law on this subject is found in section 950 of Civil Code of South Carolina, digested from 17 St. at Large, pp. 1015, 1053, Act 1882. This section requires "the register of mesne conveyances to record in suitable books in the order of time in which they

may be brought to his office, all marriage settlements and all conveyances and mortgages, renunciation of dower and other writings concerning the titles of land situated in his county which may be lodged with him to be recorded. Every such paper shall be recorded within one month from its lodgment and the recording shall bear even date with the lodgment. * * * Different sets of books shall be provided by the clerk and register of mesne conveyance of the several counties for the recording of chattel mortgages and mortgages of real estate, in one of which sets all chattel mortgages shall be recorded and in the other set all mortgages of real estate shall be recorded." It will be noted that the duty of recording these instruments is imposed on the register of mesne conveyances; that the paper is considered recorded from the day of its lodgment in the office; and that one month is given to the officer within which he may record the paper. It would seem, therefore, that when the deed has been lodged for recording with the proper officer all has been done that the law requires of the party so lodging it. If the officer neglected his duty either by imperfect record, omitting matters essential, or by not recording within the month, or by not recording at all, the officer, and not the mortgagee, should suffer. The statute was enacted not for the protection of the mortgagee. He was secured in his right without the statute. The protection inures for the benefit of purchasers and creditors. The breach of duty on the part of the officer is his duty to secure purchasers or creditors, and if they be damnified their remedy is against him. Wade Law of Notices, §§ 162, 170, 171. See, also, Devlin on Deeds, vol. 1, § 686, to the same effect. In Marbury v. Madison, 1 Cranch, 161, 2 L. Ed. 60, the Supreme Court held that, when all the requirements have been performed which authorize a recording officer to record any instrument whatever and the order for that purpose has been given, the instrument in law is considered as recorded, although the manual labor of inserting it in a book has not been performed. See, also, McClaskey v. Barr (C. C.) 47 Fed. 170. So, if it should be held that the recording of this mortgage in the book of chattel mortgages as well as in the book of realty mortgages was necessary, the fact that it was not so recorded perhaps would not vitiate the deed as to the mortgagee. Whilst this rule is supported by the greater number of decisions, and perhaps by the better reasons, still there are many cases holding a contradictory opinion. The cases on both sides are collected in 20 Am. & Eng. Enc. of Law (1st Ed.) 572, etc., and there is a large citation of authorities and full comment on them in Webb on Record of Title, §§ 16–18. The question never has been made in South Carolina, nor has any case arisen respecting the record of a mortgage conveying both realty and personalty. In Anthony v. Butler, 13 Pet. 434, 10 L. Ed. 229, considering a statute of Rhode Island containing provisions similar to the South Carolina statute, it was held that the recording of a mortgage covering both real estate and personalty in one book only—that is to say, in a book containing mortgages of real estate—was a sufficient compliance with the law. In Jennings v. Sparkman, 39 Mo. App. 669, quoted in the brief of the

appellee, the same doctrine is stated. That was a case of a mortgage both of real and of personal property. Under the law of Missouri, a mortgage of real estate must be recorded in the county where the real estate is situated. A mortgage of personal property must be recorded in the county where the mortgagor resides. The deed in this case was recorded in the real estate book, but not in that for personalty. It was held sufficient record. As the point had never been decided in South Carolina, we will not rest our conclusion here.

This brings us to the question: Is this a mortgage both of realty and personalty? The answer to this question depends upon the determination whether the machinery embraced in the mortgage partakes of the character of fixtures, and is therefore included in the term "realty." In determining whether or not chattels attached to or used with the freehold are fixtures, regard must be had to the relation which the parties claiming bear to each other. As between heir and executor, the rule obtains with the utmost rigor in favor of the inheritance, and against the right to consider as a personal chattel anything which has been affixed to the freehold. As between the executor of the tenant for life and the reversioner or remainderman, the right is considered more favorably for the executor. As between landlord and tenant, the tenant who claims to have articles considered as personal property is treated with the greatest latitude and indulgence. If the articles are used for the purpose of trade or manufacture, the right of the tenant to remove is even broader in extent. The strict rule as to fixtures which applies as between heir and executor applies equally as between vendor and vendee and mortgagor and mortgagee. 2 Kent, Com. (14th Ed.) 345. In a note to page 343 of the same edition we find this: "The character of the property, whether real or personal, may be fixed by contract. If no contract appears, the machine placed in the building is or is not a fixture, according to the implied intention with which it was there placed, as shown by external indications of its belonging to the building and as an article designed to become part of it or not, or merely for a temporary purpose or the more complete use and enjoyment of it as a chattel." To this the annotator quotes many authorities. In the text of that page we find: "The question whether an article be a fixture or not is governed very much by the intention of the owner and the purpose for which the erection was applied." In Hill v. Farmers' & Mechanics' National Bank, 97 U. S. 450, 24 L. Ed. 1051, we see an application of this rule as to intention. Hill bought certain lots in Georgetown, D. C., for the purpose of erecting a paper mill thereon. He carried out this intention by altering the buildings, introducing machinery and water power. He executed a deed of trust by way of mortgage to secure certain notes. The notes falling due and being unpaid, the trustee sold the property, but did not include in the sale the machinery. Suit was instituted to set aside this sale on the ground that the property was a unit, and that the machinery should have been sold with the other property as a part of the unit. This contention was sustained below, and it was affirmed on appeal. Among other things the court says: "Without water power the machinery would be worthless, except to

be torn out and moved. By placing it in the buildings in constructing the mill, every part and parcel of it, as between mortgagor and mortgagee, became a fixture and a part of the freehold." The same rule, that the intention is the test by which is determined whether the article is a fixture or not, is followed in Hopewell Mills v. Taunton Savings Bank, 150 Mass. 519, 23 N. E. 327, 6 L. R. A. 249, 15 Am. St. Rep. 235, and is sustained by numerous quotations. The matter is summed up thus: "These cases seem to recognize the true principle on which the decision should rest, only it should be noted that the intention to be sought is not the undisclosed purpose of the actor, but the intention implied and manifested by his act. It is an intention which settles not merely his own rights, but the rights of others who have or may acquire interests in the property. In this commonwealth it has been said that whatever is placed in a building subject to a mortgage by a mortgagor or those claiming under him to carry out the purpose for which it was erected, and permanently to increase its value for occupation or use, although it may be removed without injury to itself or the building, becomes a part of the realty." To the same effect is Richardson v. Copeland, 6 Gray, 537, 66 Am. Dec. 424. In Pennsylvania the same principle prevails. "Machinery contained in a mill or factory is part of the realty; whether it was made fixed and stationary by physical means or detached, it is machinery which is employed in and devoted to the business." Voorhis v. Freeman, 2 Watts & S. 116, 37 Am. Dec. 490. Clearly this conclusion was based on the same idea as in Hill v. National Bank, supra, that the machinery and the building constituting the mill made a unit. So, also, is the law in Illinois (Fifield v. Farmers' Nat. Bank, 35 N. E. 802, 39 Am. St. Rep. 166), and in New Jersey (Feeder v. Van Winkle, 33 Atl. 339, 51 Am. St. Rep. 628). The case of Rogers v. Brokaw, 25 N. J. Eq. 497, relied on by appellants, is in line with the cases quoted. The real question was the intent of the parties. The case showed that this intent was to keep the land and the machinery distinct: (1) The mortgagor executed to a third party a chattel mortgage of the machinery. (2) The real estate mortgage made mention only of the land, and was silent as to the machinery. These cases sustain and justify the conclusion of the District Judge in this case, "that if there is an intent to incorporate the chattels with the real estate for the uses to which the real estate is appropriated, and the chattels are annexed to the freehold, and are fitted for and applied to the use to which the real estate is appropriated, all being designed for and necessary to the prosecution of a common purpose, then machinery and land become unified and are subject to the lien of the real estate mortgage." We have examined the South Carolina cases quoted by the appellants, and do not find that they assert a doctrine different from that stated above. Evans v. McLucas, 15 S. C. 70, was a case which decided the question as between landlord and tenant. Yet that case declares that the manifest intention of the party must govern. Blauvelt v. Dickinson, reported as Ex parte Dickinson, 29 S. C. 455, 7 S. E. 593, 1 L. R. A. 685, 13 Am. St. Rep. 749, held that a portable engine carried on land for the purpose of sawing timber cut, was not a fixture, the evident intention in

the use of such an engine being for a temporary purpose only. Padgett v. Cleveland, 33 S. C. 339, 11 S. E. 1069, turned also on the question of the intent of the parties, and the chattels were held not to be fixtures, that being the manifest intent. Hughes v. Shingle Company, 51 S. C. 2, 28 S. E. 2, was upon similar facts and was decided for the same reason as Ex parte Dickinson, the question being whether a portable engine was a fixture. On the other hand, the early case of Fairis v. Walker, 1 Bailey, 541, after stating the distinction as to fixtures between heir and executor, vendor and vendee, and as between landlord and tenant, says: "If a freehold fitted up for trade or manufacture of a particular kind is sold to a person intending to follow the same business, then all the machinery necessary to the trade or manufacture so intended to be carried on would pass." A mortgagor and mortgagee stand on the same footing as a vendor and vendee. This case in Bailey followed a case, not then reported, of Nimmons v. Moye, 1 Rice, Dig. 317. The Moye Case was subsequently reported, and affirmed in McKenna v. Hammond, 3 Hill, 331, 30 Am. Dec. 366. The leading case is repeatedly recognized and affirmed so far down as Hughes v. Shingle Co., 51 S. C. 1, 28 S. E. 2. In the Civil Code of South Carolina of 1902, § 265, which repeats section 221 of the Revised Statutes of 1893 and section 167 of the General Statutes of 1882, is this definition of the term "real property": "It shall be held to mean and include not only land, city, town and village lots, but all structures and other things therein contained or annexed or attached thereto which pass to the vendee by the conveyance of the land or lot." And section 273 of the same Code, in designating what a manufacturer must list for taxation, says: "He shall also list at the full value all machinery, tools, implements, fixtures and engines used or purchased for use in his business (except such as have been appraised for taxation as part of the realty)." If we look to the intention of the mortgagor in this case— an intention to be sought not in the undisclosed purpose of the parties, but the intention implied and manifested by their act—we must conclude that the machinery of this mill was intended to be of the character of fixtures. The mortgagor was the owner of the fee in the land. There had been formed the fixed purpose to get into the business of manufacturing. To this end was dedicated this tract of 190 acres for the sole purpose of manufacture. The building was erected as a mill upon the land, and put up around it were the homes of the operatives. Having concluded to establish the business of manufacturing cotton, valuable machinery was contracted for and bought, specially adapted to this purpose only, and installed in the mill. This machinery had been "placed in the building by the mortgagor to carry out the obvious purposes for which it was erected, and to permanently increase its value for occupation, and so it became part of the realty." McConnell v. Blood, 123 Mass. 47, 25 Am. Rep. 12. Having done all this, there were united in one mortgage the mill and the land and all the machinery, making of them a unit, and involving them in a common fate, the language of the mortgage being such as is used peculiarly for mortgages of realty.

As between the mortgagor and mortgagee the machinery were

fixtures, a part of the realty, and the mortgage was properly recorded in a book set apart for mortgages of realty.

We concur fully in the opinion of the court below. The decree of the District Court is affirmed.