## SCOTT et al. v. ABBOTT.

(Circuit Court of Appeals, Eighth Circuit. March 27, 1908.)

No. 2,607.

1. CORPORATIONS—INCREASE OF CAPITAL STOCK—VALIDITY—"FICTITIOUS."

Const. Mo. art. 12, § 8 (Ann. St. 1906, p. 304), ordains that "no corporation shall issue stock * * * except for money paid, labor done or property actually received; and the fictitious increase of stock * * * shall be void." Rev. St. Mo. 1899, § 962 (Ann. St. 1906, p. 860), re-enacts such prohibition. Section 1327 (Ann. St. 1906, p. 1071) provides that "any corporation increasing its capital stock shall before the same shall take effect cause to be paid up of such increase * * * not less than fifty

per cent.," and section 1329 (Ann. St. 1906, p. 1072) requires the increase to be authorized by the stockholders, and a verified and acknowledged statement by the officers to be made, recorded, and furnished to the Secretary of State, setting forth the action of the stockholders, the present capital stock, the assets and liabilities of the corporation, the amount to which the capital is to be increased, and the percentage of such increase that has been actually paid up in lawful money, and that it is in the custody of the board of directors, whereupon the Secretary of State shall issue a certificate that the corporation has complied with the law and showing the amount to which its capital stock has been increased. A corporation duly voted to increase its capital, a statement in due form was executed, stating that all of the increased capital had been paid up, and was in the custody of the directors, and the Secretary issued the required certificate. No part of the increased stock had in fact been paid for, and the statement was also false as to the corporation's assets and liabilities, but it afterward issued and sold a large part of such stock receiving payment therefor. *Held*, that the statement was one of the details required for obtaining the certificate, and its truthfulness was not fundamental to the validity of the stock; that, the corporation having received payment for it in money, which was the substantial requirement, it was not "fictitious and void" under the constitutional provision.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 3, p. 2754.]

2. BANKRUPTCY—CLAIMS AGAINST ESTATE—ESTOPPEL TO ASSERT.

Any person becoming a creditor of a corporation has a right to rely on the security afforded by the money paid by the stockholders for its capital stock; and although stockholders may have been induced to become such by false and fraudulent representations made by its officers, which would entitle them to rescind their contracts and recover the money paid for such stock as between them and the corporation, where they have remained stockholders and received dividends for some years, during which the corporation has contracted indebtedness, they cannot exercise such right of rescission as against its creditors after it has become a bankrupt, and share as creditors in its estate.

Appeal from the District Court of the United States for the Eastern District of Missouri.

The appellants, who by consent and on one record prosecute joint appeals to this court, were separate holders of preferred stock in the Tennent Shoe Company, a manufacturing and business corporation, organized under and pursuant to the general laws of the state of Missouri. The shoe company originally had a capital stock of $400,000. It undertook to comply with the provisions of the statutes of Missouri to increase its capital stock to $800,000, and to make $300,000 thereof preferred stock and $100,000 common stock. At a meeting of the stockholders called for the purpose, pursuant to the provisions of section 1329, Rev. St. Mo. 1899 (Ann. St. 1906, p. 1072), a resolution was adopted providing for the increase. Subsequently a statement of the proceedings of the meeting, showing compliance with the provisions of the statute, was duly signed, verified, acknowledged, and recorded in the recorder's office of the city of St. Louis, as required by law, and a certified copy of the same was filed in the office of the Secretary of State on December 28, 1903. Upon that day a certificate was issued by the Secretary of State, to the effect that the corporation had complied with the law for the increase of its capital stock, and that the same had been increased to the extent of $400,000; $300,000 preferred, and $100,000 common stock. The instrument so recorded and filed contained the statement that the amount of capital stock of the company paid up was $400,000, that the amount of assets of the company was $1,387,066.82, that the amount of its liabilities was $501,460.99; that the amount to which the capital stock was increased was $800,000, and that all said increase of capital stock had been actually paid up in lawful money of the United States, and was in the hands of the board of directors of the company. Cotemporaneously with securing this certificate the officers

of the company arranged with the Little & Hays Investment Company of St. Louis for the sale of the preferred stock, and placed in their hands, at the time, a written statement, over the signature of the corporation by its president, John H. Tennent, to the effect that $300,000 of preferred stock had just been issued in strict conformity with the laws of Missouri; that all the common and part of the preferred stock was owned by the officers and directors of the company; that the total net earnings available for annual dividends would not be less than five times the amount required for dividends on the preferred stock. They also gave the investment company a written statement, falsely setting forth in detail the assets and liabilities of the company, and that it had received paid subscriptions to its increased capital stock amounting to $400,000, which made its capital and surplus $885,605.83. Those statements, together with others of similar character, were delivered to the investment company for the purpose of having them exhibited to the public, to bring about sales of the preferred stock. The investment company, making use of them for the intended purpose, in the course of a year sold some over 2,000 shares of the stock, accounted to the shoe company for about 90 per cent. thereof, and retained the balance as its commission. The appellants, Scott, Martin, and Gauss, were among the purchasers. The shoe company, through sales made by the investment company and others, making use of the same statements, realized about $300,000 from the total sales of all stock. Soon after receiving the certificate of increase the shoe company commenced paying quarterly dividends on the preferred stock so sold, at the rate of 7 per cent. per annum, and continued so doing during the years 1904 and 1905, the last payment being made on January 1, 1906. In January, 1906, an examination of the books of the shoe company was made at the instance of the preferred stockholders, and disclosed the fact that the company was insolvent, and had been so for years, and was so when its capital stock was increased; that the statements made by the company to secure the increase of capital and otherwise to influence purchasers were false and fraudulent, and that the evidence of their falsity had been concealed from the stockholders and public by the president of the shoe company. It further turned out that the increased stock had not been subscribed or paid for at the time the statement was made for securing the increase, and never had been paid for, except as the investment company and others sold the same and turned over the proceeds to the shoe company. The appellants bought their stock upon the faith of the representations made in the statements so made and uttered by the shoe company and repeated by the investment company. Investigation into the affairs of the company proceeded during the months of January and part of February when, upon the advice of counsel, the appellants repudiated their contract of purchase, and tendered back the stock and dividends which they had received from the shoe company. About that time, on February 10, 1906, a petition in bankruptcy was filed against the shoe company, which was afterwards confessed by the company, and an adjudication followed on March 2, 1906. Appellants undertook to prove claims against the estate in bankruptcy for the amount of money paid by them, respectively, for their preferred stock less such dividends as they had received thereon. Their claims were disallowed by the referee, and his action was approved by the district court on proper proceedings bringing it there for review. The present appeal challenges the rulings so made.

Joseph S. Laurie and Frederick N. Judson (John F. Green, on the brief), for appellants.

B. Schnurmacher and Lee W. Grant (Leo Rassieur, on the brief), for appellee.

Before HOOK and ADAMS, Circuit Judges, and CARLAND, District Judge.

ADAMS, Circuit Judge (after stating the facts as above). Appellants claimed below, and now claim here, that they are entitled to prove their claims against the estate of the shoe company in bankrupt-

cy, for two reasons: First, because the issue of preferred stock, of which they acquired a part, was fictitious and void, in that it was never subscribed or paid for, as required by the Constitution and statutes of Missouri, and consequently they never sustained the relation of stockholders to the company, but that of creditors to the extent of the money paid for their stock; second, because they were induced to purchase the same by false and fraudulent representations made by the corporation and its agents, and repudiated and rescinded their contracts of purchase upon discovering the fraud practiced upon them. We will consider these two propositions in the order in which they are stated.

Article 12, § 8, of the Constitution of Missouri (Ann. St. 1906, p. 304), ordains that:

"No corporation shall issue stock or bonds except for money paid, labor done or property actually received; and the fictitious increase of stock or indebtedness shall be void. The stock and bonded indebtedness of corporations shall not be increased, except in pursuance of the general law, nor without the consent of the persons holding the larger amount in value of the stock first obtained at a meeting called for the purpose, first giving sixty days' public notice, as may be provided by law."

The pertinent statutes enacted to carry this constitutional provision into effect are sections 962, 1327, and 1329 of the Revised Statutes of Missouri 1899 (Ann. St. 1906, pp. 860, 1071, 1072). Section 962 is a re-enactment of the constitutional prohibition providing that the shares of stock or bonds arising from an increase thereof shall only be disposed of "for money paid, labor done or money or property actually received," and that "all fictitious issues or increase of stock or of bonds shall be void." Section 1327, relating especially to "manufacturing and business companies," provides that:

"Any corporation increasing its capital stock shall before the same shall take effect, cause to be paid up of such increase of capital stock not less than fifty per cent. in lawful money of the United States."

Section 1329 makes provision for holding a meeting and taking the vote of stockholders on a proposition to increase or diminish the amount of capital stock, and provides that:

"A statement of the proceedings showing a compliance with the provisions of this article, the amount of capital actually paid in * * * the whole amount of assets and liabilities of the corporation, and the amount to which the capital stock shall be increased or diminished, shall be made out, signed and verified by the affidavit of the chairman, and be countersigned by the secretary; and such statement shall be acknowledged by the chairman, and recorded, as provided in section 1313, and a certified copy of such recorded instrument shall be filed in the office of the Secretary of State, who shall thereupon issue a certificate that such corporation has complied with the law made and provided for the increase or decrease of capital stock, as the case may be, and the amount to which such capital stock is increased or decreased; and such certificate shall be taken in all courts of this state as evidence of such increase or decrease of stock; and thereupon the capital stock of such corporation shall be increased or diminished to the amount specified in such certificate: * * * Provided, that in case of increase of capital stock, the statement above provided for shall set out the percentage of the increase that has been actually paid up in lawful money of the United States, and that it is in the custody of the board of directors."

1. The first contention of appellants is that the preferred stock was void ab initio; that money paid for it was without consideration, and is held by the corporation as money had and received, for the use of the depositor. It is not claimed that the shoe company, in its proceedings to effect the increase, failed to comply with any of the formal requirements of the statute. Neither is it claimed that the certificate of the Secretary of State evidencing such compliance and sanctioning the increase of stock is in any respect informal or incomplete; but it is claimed that the shoe company falsely stated, in its statement provided for by section 1329, that its proposed increased stock "had been actually paid up in lawful money of the United States, and was in the hands of its board of directors"; whereas, in truth and in fact, none of it had then been either subscribed or paid for. For this reason it is claimed the issue was fictitious and void, within the meaning of the Constitution and statutes of Missouri. It must be conceded, we think, from the proof before us that the statement so made was false. No part of the increase had actually been subscribed or paid for, and the excessive assets over liabilities as shown in the statement, which might have afforded the basis of an increase for the purpose of capitalizing the surplus, was fictitious, and did not exist in fact.

Does the fact that the authorized preferred stock had not been subscribed or paid for before the statement was made and the certificate of conformity was issued by the Secretary of State render the whole issue fictitious and void? As we interpret the statutes of Missouri on the subject of increasing the capital stock of an existing corporation, a scheme is provided by which such increase may be authorized, and thereby a subject of sale created. It is only after the increase is authorized that a company can have any increased stock to offer for subscription and sale. The Constitution of the state makes little reference to the method of authorizing or increasing capital stock. It provides merely that it shall not be increased, except pursuant to general law, with the consent of persons holding a majority in value of the stock, and after sixty days' notice, as may be provided by law. The important prohibition relates to the use to be made of the stock after it is authorized. It ordains that "no corporation shall issue stock * * * except for money paid, labor done or property actually received and all fictitious increases of stock * * * shall be void." The word "issue" here employed is obviously used in its ordinary commercial or financial sense, meaning "to emit," "put into circulation," or "dispose of securities" already authorized and prepared for disposition. Black's Law Dictionary; Century Dictionary; Folks v. Yost, 54 Mo. App. 55, 59. The word "fictitious" employed in the Constitution is found in immediate connection with the prior provision relating to the issue of stock, and by the most natural and familiar rule of construction ought to be construed in connection with it; and as so construed, it means, in our opinion, that all increases of capital stock which are not issued for money paid, labor done, or property actually received are fictitious and void. The record discloses that the shoe company disposed of or put into circulation much, if not all, of its increased stock. Such disposition, in our opinion, amounted to the issue of the stock within the contemplation of the constitutional pro-

vision. The shoe company received in actual money the substantial sum of about 90 cents on the dollar per share for all of its preferred stock, sold by or on its account, and this, of course, includes that sold to the appellants in this case. In view of this fact it cannot be successfully claimed that the stock so issued—that is, put into circulation or disposed of—was fictitious within the meaning of the Constitution of Missouri or the re-enactment of its provisions in section 962. This conclusion is supported by the following authorities: Memphis, etc., Railroad v. Dow, 120 U. S. 287, 7 Sup. Ct. 482, 30 L. Ed. 595; Sioux City, O. & W. R. Co. v. Manhattan Trust Co., 34 C. C. A. 431, 92 Fed. 428; William Firth Co. v. South Carolina Loan & Trust Co., 59 C. C. A. 73, 122 Fed. 569; Van Cleve v. Berkey, 143 Mo. 109, 44 S. W. 743, 42 L. R. A. 593; State ex inf. Attorney General v. Hogan, 163 Mo. 43, 63 S. W. 378; Rumsey Mfg. Co. v. Kaime, 173 Mo. 551, 73 S. W. 470; Peoria & Springfield R. R. Co. v. Thompson, 103 Ill. 187; Stein v. Howard, 65 Cal. 616, 4 Pac. 662.

Not only so, but section 1327, Rev. St., affords very persuasive evidence of the correctness of the foregoing conclusion. It provides, not that 50 per cent. at least of the increase must be paid for before the statement is made to secure its authorization, but before the increase "shall take effect." This phraseology seems to assume the completion of proceedings to secure an increase of stock before payment is required; and wisely provides that it shall not take effect as a recognized addition to the capital stock or increased liability of a corporation until it is at least half paid up. As further support to the conclusion reached attention is called to the fact that there is no statutory provision for making any preliminary subscription to increased stock like that made by section 1327 Rev. St. (supra), with reference to the original stock of a manufacturing and business corporation. That statute is in pari materia with the one under consideration, and may properly be considered in ascertaining the legislative intent.

2. In apparent conformity with the provision of section 1329, Rev. St. Mo. 1899, the recorded statement made by the officers of the shoe company set forth "that all of the increase of capital stock had been actually paid up in lawful money of the United States, and was in the hands of the board of directors of the company." This last statement was doubtless false in fact. None of it had then been sold, and no proceeds of sales were then in the hands of the board of directors. But the statement as a whole was correct in form, and set forth facts which justified the Secretary of State in issuing the certificate. He acted upon it, and issued the certificate of compliance, which operates under the laws of Missouri as an official declaration of a lawful increase of stock. The statement cannot now be assailed on the ground of its falsity in the particular just mentioned. Assuming that a statement on the subject falsified was one of the details required by law for securing a certificate of increase, its truthfulness was not fundamental to the validity of the increase. We have already seen that the stock was paid for when it was actually issued. The failure to have 50 per cent. or more of the increased capital actually paid for, and that amount of money actually in the custody of the board of directors before the required statement was executed

by the officers of the company, was, at worst, an irregularity in the method of paying up the increase. The subsequent sale of the stock by the shoe company and receipt by it of its fair and reasonable value were the substantial things. The appellants cannot in this collateral way challenge the regularity of the proceedings, or truthfulness of the statement of facts which resulted in the certificate issued by the Secretary of State. Otherwise any other stockholders could do the same thing, and the entire issue of stock would be subject to innumerable and constant attacks. In this way corporate enterprises would be ruinously harassed and embarrassed. The success of business, the stability of values, and an obvious wise public policy demanded some arbiter. The statute provided this arbiter in the Secretary of State, and made his decision, expressed in his certificate of compliance, conclusive as to all persons, except the state itself, of the validity of the issue. First National Bank v. Rockefeller, 195 Mo. 15, 93 S. W. 761; Chubb v. Upton, 95 U. S. 665, 24 L. Ed. 523; Handley v. Stutz, 139 U. S. 430, 11 Sup. Ct. 530, 35 L. Ed. 227, and cases cited.

3. Do the false and fraudulent statements made by the shoe company and its agents warrant the attempted rescission by appellants of their contracts of purchase? There is some difference in the facts attending the purchase of stock by the three appellants. Scott acquired his directly from the shoe company, in reliance, however, upon one of the false statements furnished the investment company by the shoe company. Gauss and Martin purchased theirs directly from the investment company. But in the view we take of this case these differences are immaterial. Much evidence appears to have been taken and considerable attention was given below to the question whether the investment company originally purchased the stock from the shoe company, or whether it acted as its agent in disposing of it. This question was not answered by the referee or the court below, and in our opinion does not require determination by us. Whether the investment company sold it as owner or agent, it made use of the false statements purporting to show the true financial condition of the shoe company, which had been furnished to it by the shoe company for that purpose. The latter company, when it placed these false statements in the hands of the investment company, knew they were false, and intended they should be used to induce purchasers to buy its stock. In other words, it knew that the statements were adapted to deceive and were to be employed for that purpose. In such circumstances the law reinforces the plain moral obligation, and holds the maker of them liable to persons deceived by them. City Bank of Columbus v. Phillips, 22 Mo. 85, 64 Am. Dec. 254; Clark v. Edgar, 84 Mo. 106, 54 Am. Rep. 84; Holmes v. Harrington, 20 Mo. App. 661; Gries v. Blackman, 30 Mo. App. 2; Bank v. Lanier, 11 Wall. 369, 378, 20 L. Ed. 172; Windram v. French, 151 Mass. 547, 24 N. E. 914, 8 L. R. A. 750; Peterson v. People's Building, Loan & Savings Ass'n, 124 Mich. 573, 83 N. W. 606; Cazeaux v. Mali, 25 Barb. (N. Y.) 578, 583; Williams v. Wood, 14 Wend. (N. Y.) 127; 1 Cook on Corporations (5th Ed.) § 144.

4. The record shows that at least $275,000 of the present indebted-

ness of the shoe company was contracted after all the stock now in question had been purchased by the appellants. It also shows that the shoe company represented generally to the public and to persons from whom it sought credit (amongst other things already referred to) that it had a capital stock, fully paid up, of $800,000, of which $500,000 was common, and $300,000 was preferred stock. It made statements to the same effect to R. G. Dun & Co., a widely known commercial agency, and in addition thereto it stated that $400,000 of new money had been paid into the company as a result of the increase of its stock. Similar statements were made to banks of the city of St. Louis for the purpose of securing loans of money; and, as a result, large loans were actually made to the shoe company, many of which are still due and will never be paid, except in so far as the dividends which may be declared in the bankruptcy proceeding may do so. These dividends will be small. The record shows that claims amounting to $633,439.97, exclusive of claims like those we are now considering, have been allowed against the estate, and that the assets amount to only about $230,000. It thus appears as a fact proved in this case that creditors dealt largely with the shoe company, and made loans of money to it, after the increase of its stock, in reliance upon the fact and validity of that increase. Indeed, if it had not been proved, the law would indulge the presumption that credit was given to the shoe company in reliance upon its increased capital. Palmer v. Bank of Zumbrota, 72 Minn. 266, 75 N. W. 380. The record further discloses that dividends on the preferred stock were paid quarterly by the shoe company, at the rate of 7 per cent. per annum, and that each of the appellants received the regular dividends on his holdings from the time of their purchase until and including January 1, 1906. Each of them received from four to eight quarterly dividends on their stock, dependent upon the time when they, respectively, made their purchases.

From the foregoing summary of the main and essential facts we find ourselves confronted with the following question of law: Whether persons who have been induced by false statements of the officers of a corporation to innocently purchase some of its preferred stock, and who for a year or more have accepted dividends declared quarterly upon the stock purchased by them, may, after discovering the falsity of the statements made, and after a state of insolvency and actual bankruptcy of the corporation has supervened, repudiate their purchases, and participate in the assets of the insolvent estate pro rata with general creditors who innocently contracted their debts on the strength of the validity of the increase of stock and of the additional resources which appellants and others similarly situated have reasonably caused them to believe the corporation possessed? Ordinarily it is true that any person who has been deceived by false and material statements of another into making a contract with him may, by timely action and observance of other equitable principles, rescind the same and recover back money paid in its performance. And this is ordinarily true when individuals make contracts with corporations. The executive officers of the corporations, acting within the scope of their general authority, may so misrepresent material facts as to entitle per-

sons dealing with them to rescind their contracts. But is there nothing in the present case which differentiates it from such cases? Appellants have admittedly been for some time and now are prima facie stockholders of the shoe company, and nothing else. They have from the beginning allowed themselves to be held out as such. The real party against which they are seeking relief is the body of general creditors of their corporation. Whatever relief may be granted to them in this case will reduce the percentage which the general creditors will ultimately realize upon their claims. Although a corporation is in law treated as an entity separate from its component stockholders, the latter are, in substance, all there is to a corporation. They, by their duly chosen agents conduct all its business. They enjoy the net earnings which is the final object and purpose of a manufacturing and business corporation. They own all the assets, but own the same subject to a well-recognized prior right of creditors thereto.

In Sawyer v. Hoag, 17 Wall. 610, 623, 21 L. Ed. 731, Mr. Justice Miller, speaking for the Supreme Court on the relation of a corporation to its stockholders, uses the following language:

"It is very true that by the power of the Legislature there is created in all acts of incorporation a legal entity, which can contract with its shareholders in the ordinary transactions of business as with other persons. * * * But, after all, this artificial body is but the representative of its stockholders, and exists mainly for their benefit, and is governed and controlled by them through the officers whom they elect. And the interest and power of legal control of each shareholder is in exact proportion to the amount of his stock. It is, therefore, but just that when the interest of the public or of strangers dealing with this corporation is to be affected by any transaction between the stockholders who own the corporation and the corporation itself, such transaction should be subject to rigid scrutiny, and if found to be infected with anything unfair towards such third person, calculated to injure him, or designed intentionally and inequitably to screen the stockholder from loss at the expense of the general creditor, it should be disregarded or annulled so far as it may inequitably affect him."

In Sanger v. Upton, Assignee, 91 U. S. 56, 60, 23 L. Ed. 220, Mr. Justice Swayne, speaking for the Supreme Court on the same subject, said:

"The capital stock of an incorporated company is a fund set apart for the payment of its debts. It is a substitute for the personal liability which subsists in private copartnerships. When debts are incurred, a contract arises with the creditors that it shall not be withdrawn or applied, otherwise than upon their demands, until such demands are satisfied. The creditors have a lien upon it in equity."

In Hawkins v. Glenn, 131 U. S. 319, 329, 9 Sup. Ct. 739, 742, 33 L. Ed. 184, Mr. Chief Justice Fuller, speaking for the court, said:

"A stockholder is so far an integral part of the corporation that, in the view of the law, he is privy to the proceedings touching the body of which he is a member."

See, also, to the same general effect, the following cases: Glenn v. Liggett, 135 U. S. 533, 10 Sup. Ct. 867, 34 L. Ed. 262; Fogg v. Blair, 139 U. S. 118, 11 Sup. Ct. 476, 35 L. Ed. 104; Hollins v. Brierfield Coal & Iron Co., 150 U. S. 371; 14 Sup. Ct. 127, 37 L. Ed. 1113.

From the principles just enunciated it follows that any persons loaning money to a corporation, or otherwise becoming its creditor, may do so in reliance upon the protection and security which the money invested by the shareholders in the capital stock of the company affords them. This is not only theoretically true, but common experience teaches that it is practically true also. It is a common thing for corporations of the present day to advertise the amount of their capital and surplus as a ground of confidence in them. Money is deposited in banks largely on the assurance which the capital and surplus affords, and banks, on the other hand, as well as others, loan their funds to corporate borrowers largely on the strength of their advertised capital. Accordingly, when the banks and others, who now occupy the position of general creditors of the estate of the bankrupt shoe company, loaned their money to the latter company, they were at liberty to regard, and did regard, the advertised paid-up capital, consisting in part, at least, of $300,000, resulting from the sale of the increased stock in question, as an actual existing fund available to them for the satisfaction of their debts before the stockholders had any right to appropriate it; and the stockholders of the shoe company, including appellants, invested their money in its stock in full recognition of the law and presumably of the fact that others might deal with the company and become its creditors on the strength of the capital contributed by them. There is no difference between the holders of preferred and common stock in the respects just alluded to. The rights of the former as against creditors are in no respect different from those of the latter. The owners of preferred stock generally have certain rights of precedence over the owners of common stock in dividends and final distribution of assets; but the rights of both are alike subordinate to those of creditors.

In view of the foregoing facts and principles the rights of the innocent general creditors are superior to those of the deceived stockholders. It is a familiar, general principal of law, as well as of morals, that when one of two innocent parties must suffer by the fraud of another, the one who has enabled such third party to commit the fraud ought to sustain the loss. United States Bank v. Bank of Georgia, 10 Wheat. 333, 344, 6 L. Ed. 334; Friedlander v. Texas, etc., Ry. Co., 130 U. S. 416, 425, 9 Sup. Ct. 570, 32 L. Ed. 991; Rice v. Groffmann, 56 Mo. 434, 437; International Bank v. German Bank, 71 Mo. 183, 197, 36 Am. Rep. 468; Smith v. Armour Packing Co. (C. C. A.) 158 Fed. 86; Chapman v. Rose, 56 N. Y. 137, 141, 15 Am. Rep. 401; Scanlon-Gipson Lumber Co. v. Germania Bank, 90 Minn. 479, 488, 97 N. W. 380. Reference may also be made to 16 Cyc. p. 703, for a statement of the rule and collection of many cases in which it has been recognized and followed. Applying this rule to the facts of the present case, there seems to be no escape from the conclusion that the purchasers of the preferred stock in question largely contributed to the ability of the shoe company and its officers to occasion loss to its general creditors. Within the limitation of the rule made appropriate by the peculiar facts of the case of Western Union Telegraph Co. v. Schriver, 72 C. C. A. 596, 141 Fed. 538, 4 L. R. A. (N. S.) 678, the same result would follow. The stockholders gave their agents the

officers of the corporation, the opportunity, and endowed them with power to advertise and hold out to the public, as an inducement to extend credit to their company, the fact that their new stock had been sold, and that the proceeds thereof had been paid in; and the stockholders, including appellants, had reason to believe and must be held to have known that their agents, in the usual course of business, would avail themselves of their opportunity and exercise their power accordingly. Under any possible view of the case the appellants are estopped from asserting their claims against the right of the general creditors who acted to their prejudice upon the representations made by the agents of appellants and the other stockholders.

5. The Supreme Court of the United States, in the case of Scott v. Deweese, 181 U. S. 202, 21 Sup. Ct. 585, 45 L. Ed. 822, considered the double liability of stockholders in national banks, provided for by section 5151 of the Revised Statutes (U. S. Comp. St. 1901, p. 3465), and in that case a question arose, much like that now before us, touching the effect of false statements and false representations made by the officers of the bank. It was there said by Mr. Justice Harlan, speaking for the court (page 213 of 181 U. S., page 589 of 21 Sup. Ct. [45 L. Ed. 822]):

"If the subscriber became a shareholder in consequence of frauds practiced upon him by others, whether they be officers of the bank or offices of the government, he must look to them for such redress as the law authorizes, and is estopped, as against creditors, to deny that he is a shareholder, within the meaning of section 5151, if at the time the rights of creditors accrued he occupied and was accorded the rights appertaining to that position."

We find in the present case all the elements upon the assumption of which Mr. Justice Harlan made the observation just quoted. The appellants, at the time the rights of most, if not all, of the general creditors of the shoe company accrued, occupied the position of shareholders, and were accorded rights as such, including the right, which was frequently exercised, of sharing in the supposed net earnings of the company in the form of dividends.

In the Scott Case the Supreme Court had under consideration many phases of the relation of stockholders to national banks and to their creditors, both before and at the time of the failure of the bank, and the case contains an instructive consideration of the general subject, as well as a review of prior authorities on the same and kindred questions. While it is there assumed, without commitment, however, that a stockholder may, by proper proceedings, instituted in good faith and in due time before the suspension of a bank, secure a rescission of his contract of subscription for fraud practiced upon him by the officers, yet the case affords direct authority for what we deem to be a just and practical general rule: That when one has for a considerable period of time prior to the failure of a corporation occupied the position of one of its stockholders, and exercised and enjoyed the rights, privileges, and fruits of that relation, including the chance of enhanced value of his holdings, when fortune frowns, and the chances turn against him, it is too late to assert, as against creditors of the corporation, the right to rescind his contract of stock subscription on the ground of false representations after a state of

insolvency has supervened, and after proceedings to wind up the corporation for the benefit of creditors have been or are about to be instituted.

A case involving the foregoing elements inevitably discloses such want of diligence, such delay or inactivity, or such counter-equities in favor of creditors as within well-recognized principles precludes resort to a court of equity for redress by a defrauded stockholder. The rule just announced has not been established without opposition and vigorous dissent, but we think it is now so firmly fixed as to command general obedience. This appears, not only by the Scott Case already considered, but by the following cases: Newton Nat. Bank v. Newbegin, 20 C. C. A. 339, 74 Fed. 135, 33 L. R. A. 727; Scott v. Latimer, 33 C. C. A. 1, 89 Fed. 843; Lantry v. Wallace, 182 U. S. 536, 21 Sup. Ct. 878, 45 L. Ed. 1218; Ib., 38 C. C. A. 510, 97 Fed. 865; Hood v. Wallace, 182 U. S. 555, 21 Sup. Ct. 885, 45 L. Ed. 1227; Wallace v. Hood (C. C.) 89 Fed. 11.

Learned counsel for appellants have called our attention to many cases, all of which have been carefully considered. Some of them have fallen by the way in the progress of the development of the rule just announced. Others being inconsistent with that rule, and with what we believe to be the doctrine of the Supreme Court, cannot receive our approbation.

Other minor questions were ably argued at the bar, but as they are unimportant in view of our conclusion on the more fundamental questions already considered, we will not prolong this opinion by discussing them.

The decree of the district court was for the right party, and it is accordingly affirmed.