NEW YORK, C. & ST. L. R. CO. v. NIEBEL.

(Circuit Court of Appeals, Sixth Circuit. June 12, 1914.)

No. 2462.

1. MASTER AND SERVANT (§ 228*)—NEGLIGENCE (§ 101*)—INJURY TO SERVANT — FEDERAL EMPLOYERS' LIABILITY ACT — CONTRIBUTORY NEGLIGENCE — DAMAGES.

Under the federal Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. Supp. 1911, p. 1322]), a railroad company is liable where through employés it is guilty of any causative negligence causing injury to an employé, no matter how slight the negligence is in comparison to the negligence of the injured employé; but the damages must be proportioned between the parties according to their respective fractions of the total negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 670, 671; Dec. Dig. § 228;* Negligence, Cent. Dig. §§ 85, 163, 164, 167; Dec. Dig. § 101.*]

2. MASTER AND SERVANT (§ 286*)—INJURY TO SERVANT—NEGLIGENCE—QUESTION FOR JURY.

Whether an engineer of a freight train running into a train attempting to take a passing track causing the death of the flagman was guilty of

negligence in the management of his train *held*, under the evidence, for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. § 286.*]

3. MASTER AND SERVANT (§ 240*)—INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE.

A rule of a railroad company required the flagman on a train so delayed that it might be overtaken by another train to go back immediately with danger signals without waiting for signals or instructions. Another rule provided for signals by the engineer for the flagman to go back and protect the rear of the train. A freight train was ordered to take a passing track at a station. The switch was blocked by snow, and there was a delay of more than ten minutes before the switch could be turned. As the train pulled into the passing track, a freight train ran into the rear cars, killing the flagman. The flagman did not go back and protect his train, nor did the engineer thereof give any signal for him so to do. He waited at least ten minutes before he took any steps to protect the train. *Held*, that the absence of signals by the engineer did not relieve the flagman from the charge of contributory negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 751–756; Dec. Dig. § 240.*]

4. NEGLIGENCE (§ 101*)—INJURY TO SERVANT—EMPLOYERS' LIABILITY ACT—DAMAGES.

In an action under the Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. Supp. 1911, p. 1322]) for the death of a flagman on a train delayed at a switch blocked with snow struck by a train following, the jury may consider all the circumstances characterizing the negligence of either party and fixing the quantity and quality of that negligence in relation to the sum total of the negligence of both parties, and, though the negligence of either appears, all circumstances of aggravation or of mitigation must be considered.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 85, 163, 164, 167; Dec. Dig. § 101.*]

5. DEATH (§ 104*)—DEATH OF SERVANT—FEDERAL EMPLOYERS' LIABILITY ACT—MEASURE OF DAMAGES—INSTRUCTIONS.

In an action under the federal Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. Supp. 1911, p. 1322]) for the death of an employé leaving a surviving wife and infant children, an instruction on the measure of damages to the wife which refers to the loss sustained by her by being deprived of her husband's companionship and association and the loss of home ties in a way to indicate the pecuniary importance thereof, and that the law attempted to be liberal with the victims of such an accident and did not direct the jury to distinguish support from companionship, was erroneous, necessitating a reversal, where the verdict at legal interest would make a permanent annuity reaching well toward the amount decedent out of his existing earnings would have devoted to the support of his wife and family as distinguished from his own.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 142–148; Dec. Dig. § 104.*]

6. APPEAL AND ERROR (§ 1140*)—REMISSION OF EXCESSIVE DAMAGES.

The error in an instruction on the measure of damages to be awarded for the benefit of the widow and infant children of one negligently killed, arising from the fact that it emphasized the wife's deprivation of her husband's companionship and association and the loss of home ties, cannot be cured by the court on appeal, for it cannot ascertain what portion of

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the damages to the wife was for loss of society as distinguished from loss of support.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4462–4476; Dec. Dig. § 1140.*]

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; John M. Killits, Judge.

Action by Emma Niebel, administratrix of Charles N. Niebel, deceased, against the New York, Chicago & St. Louis Railroad Company. Judgment for plaintiff, and defendant brings error. Reversed, and remanded for new trial.

The deceased, Niebel, was rear brakeman and flagman on a freight train going east, on the night of November 13, 1911. Gulick was engineer of a freight following 10 minutes behind. Both trains were under a common order to take the passing track at Ashtabula and there meet an opposing train. A blizzard of extreme violence was in progress. Many signal lights were blown out, the air was full of snow, and the trainmen could not see very far. When the forward train arrived at the passing track, the switch was blocked with snow. There was a delay of more than 10 minutes before the switch could be turned. As the first train was pulling into the passing track, and while about 20 cars remained on the main track occupying it for 800 feet, the rear end was struck by Gulick's engine, and the two rear cars, including the caboose, were broken up. The caboose took fire, and the remains of Niebel and of the freight conductor were found among its ruins after the fire.

Rule 99 of the railroad provides that, when a train stops or is delayed by circumstances under which it may be overtaken by another train, the flagman must go back immediately with danger signals. It further specifies that if on a straight track and where the following train can be seen for a mile, he must go back 1,000 feet, and that if intervening curves or weather conditions obstruct the view he must go back at least one-half mile, and, when recalled, shall place torpedoes on the rail.

Niebel's administratrix brought suit under the Employers' Liability Act, her finally amended petition alleging, as the actionable negligence, that Gulick approached the siding at a speed of 25 to 30 miles an hour while bound to know that the first train might be wholly or partly on the main track; whereas he should have approached with his train under such control that he could have stopped after seeing the train ahead. Several other grounds of negligence were alleged, but they were withdrawn from the jury. The defense was that Niebel did not go back and protect his train as the rules required, and that his own negligence in this respect was the proximate cause of the collision. The jury found a verdict for the plaintiff; and, under the charge, this implied a finding that Gulick was negligent in the management of his train. The railroad company brings this writ of error, and claims that a verdict should have been instructed for defendant under the undisputed testimony, for the reason that the railroad company was not chargeable with any negligence except through Niebel's own act. It also claims error in the admission of evidence, and in the charge.

C. A. Seiders, of Toledo, Ohio, for plaintiff in error.

H. W. Fraser, of Toledo, Ohio, for defendant in error.

Before WARRINGTON and DENISON, Circuit Judges, and SESSIONS, District Judge.

DENISON, Circuit Judge (after stating the facts as above). [1] The jury was instructed that, as matter of law, upon the trial record, Niebel was guilty of contributory negligence; but that, under the Em-

ployers' Liability Act, his negligence and that of the railroad (if any) through other employés should be compared, and, if the other negligence was greater than his, a verdict should be rendered for plaintiff; the total actual damages being diminished in proportion to the relative negligence of the two parties. Since the case was tried, the Supreme Court, in Norfolk Co. v. Earnest, 229 U. S. 114, 121, 122, 33 Sup. Ct. 654, 57 L. Ed. 1096, and Grand Trunk Co. v. Lindsay, 233 U. S. 42, 47, 49, 34 Sup. Ct. 581, 58 L. Ed. ——, has interpreted the act to mean that the defendant is liable, if through other employés it is guilty of any causative negligence no matter how slight in comparison to that of plaintiff, and that the total damages should be proportioned between plaintiff and defendant according to their respective fractions of the total negligence. In so far as the interpretation of the statute by the trial judge was not in accordance with these later decisions, the error was not prejudicial to defendant, and affords no ground for reversal.

[2] We agree with the trial court that plaintiff was entitled to go to the jury upon the issue whether Gulick was negligent. It is the railroad's contention that Gulick had the right and was charged with the duty to manage his train on the supposition that the employés on the train ahead would obey the rules, and in full reliance that if that train stopped on the main track a flagman would go back for its protection. Without accepting this contention at its extremest force, we may grant that Gulick had this right and carried this duty; but they constitute only the prima facie situation. The expectation that he would be duly flagged if the train ahead stopped on the main track was one of the things which Gulick rightfully had in mind in determining the handling of his train; but he could not close his mind and his eyes and his ears to everything else. He was bound to use due care in all respects. This precise problem is more fully considered in our opinion in Pennsylvania Co. v. Cole, 214 Fed. 948, 131 C. C. A. 244, this day filed. It is unnecessary to speculate what all the other elements may be which Gulick was bound not wholly to disregard or forget; and this is so because one sufficient to sustain the submission is found in Gulick's proximity, known and understood by him, to the switch which he was under orders to take. Regardless of any signals whatever, it was his duty to have his train under such control that he could stop before reaching the switch leading into the siding. He knew that he was under orders to take this siding; that the opposing train might be waiting on the main track just beyond the switch; and that Niebel's train might have been delayed in such a way as to leave it still on the main track. He knew that he could not depend upon seeing lights as usual, because many had been blown out, and such as were burning could be seen only a short distance. He knew also when he passed a point 1,600 feet from the switch. His own train was perhaps 1,400 feet long, carrying 33 loaded cars. Under these circumstances, the weather conditions intensified his duty to be running slowly and carefully when he was within 700 or 800 feet of the place where he must stop. Gulick fully recognized this duty; he testified that he knew just where he was and had slowed down to a speed slow enough to enable him to stop without difficulty at the switch. He does not state this speed, but

he says that, while he would have stopped before he reached the switch, he could not stop in the distance, which he estimates at 200 or 300 feet, at which he could and did see the lights on the caboose ahead. Is there any evidence to justify a jury in disbelieving Gulick's story as to his speed and his care at this point, and to indicate that, as plaintiff claims, Gulick was running at a speed which, at this point and under these circumstances, was recklessly great? Such evidence is found only in the details of what happened when the collision occurred. There were circumstances tending to show that the speed was as low as Gulick claimed or else different results would have followed the collision. Other circumstances tended to show that the speed was much higher—perhaps 30 miles an hour—or else some of the actual results of the collision could not have happened. This issue was peculiarly one for the jury; and we think the evidence raised an issue of Gulick's negligence proper to be submitted.

[3, 4] The only alleged error in the admission of evidence which justifies discussion is that relating to rule C-14, which reads:

"One long, followed by three short, blasts of the whistle is the signal for the flagman to go back and protect the rear of the train."

The engineer of Niebel's train gave no such signal. We need not consider whether Niebel could charge negligence against the company based on the failure to give this signal; because there was no such claim in the petition. We agree with the court below in its view that the absence of this signal could not have relieved Niebel from the charge of contributory negligence. It may well be, as urged, that when the train stopped for the switch, Niebel was under no instant duty to go back with his flag, because he could not know that the stop would be more than momentary and he could rightfully wait until he should see that there was an unusual delay; it may be that good practice required or permitted the head engineer to give the signal under C-14 as soon as he saw that the switch could not be turned, and so that there might not be even momentary delay in protecting the train; but Niebel waited at least 10 minutes, and such a delay cannot be excused by either or both the considerations just mentioned, when we take into consideration rule 241 which says:

"The rear brakeman, in cases where the rules require it, must immediately go back with danger signals, as provided by rule 99, without waiting for signals or instructions so to do."

It does not follow that rule C-14 and testimony of its meaning in practice are wholly inadmissible because its violation was neither declared upon as negligence nor could operate to justify wholly plaintiff's conduct. Under the rule of comparative negligence, the jury is entitled to consider all the circumstances which characterize the negligence of either party and which tend to fix the quantity and quality of that negligence in its relation to the sum total of the negligence of both parties. Even though the negligence of either party clearly appears, all circumstances of aggravation or of mitigation must be considered; and in view of some of the evidence found in the record regarding the proper practice under this rule, it cannot be said as matter of law that its

nonobservance could have no effect in lessening the quantum of Niebel's fault. For illustration, we may suppose that Niebel had not been killed and that the officers of the road were considering what punishment should be inflicted for his violation of rules 99 and 241. Doubtless, they would not entirely excuse him because his engineer had not signaled under rule C-14; but we cannot say that they would not take into consideration Niebel's claim that he supposed (though wrongfully) he would get a signal from his engineer, if it was necessary to send a flag back. If this excuse could be considered by the road officials in determining the ultimate character of his fault, we think it may also be considered by the jury. The rulings of the court on the admission of evidence and the charge to the jury on this subject are either beyond complaint in confining this rule to its proper effect, or can easily be so modified on another trial that there will be no just criticism.

[5] We find ourselves compelled to direct a new trial because of the measure of damages given to the jury. The parties beneficially interested were the widow and two small children. The case was tried before the decision of the Supreme Court in Michigan Central R. Co. v. Vreeland, 227 U. S. 59, 33 Sup. Ct. 192, 57 L. Ed. 417, and the charge, as given, disregarded, at least as to the widow, the distinctions pointed out between loss of support and maintenance and loss of companionship and association. We do not fail to observe that the loss of companionship and association was not put before the jury as an element of damages additional to the loss of support and maintenance quite as distinctly as had been done by the trial court in the Vreeland Case; but when we see that the references to the loss sustained by the widow's deprivation of her husband's companionship and association were repeated, that the loss of home ties was referred to in a way to indicate its pecuniary importance, that the jury was told that the law attempts to be liberal and not niggardly with the victims of such an accident and was not told to distinguish support from companionship, and when we see that the amount of the verdict would, at the legal rate of interest in Ohio, make a permanent annuity reaching well towards the amount which Niebel, out of his existing earnings, could have devoted to the support of his wife and family as distinguished from his own, we are convinced that the error in the charge on the subject of the widow's loss of association and companionship must be treated as prejudicial.

[6] We have seriously considered whether this error, although prejudicial, might be cured by permitting the plaintiff to remit a portion of the damages and thereupon affirming the judgment. We recognize the desirability of the shortening of litigation and lessening of expense which such a remittitur may accomplish. However, in the instances in which this practice has been followed by the Supreme Court (see Hansen v. Boyd, 161 U. S. 397, 411, 16 Sup. Ct. 571, 40 L. Ed. 746) and by this court (C. J. Huebel Co. v. Leaper, 188 Fed. 769, 110 C. C. A. 475; Mosby v. Printy, 194 Fed. 346, 116 C. C. A. 74), there has been mathematical basis by which it could be computed, or at least closely approximated, how much of the verdict was due to the erroneous element; and we have declined to permit such a remittitur

in a case where this computation could not be made (Chesbrough v. Woodworth, 195 Fed. 875, 887, 116 C. C. A. 465); and we are not aware of any instance where this practice has been adopted by a federal appellate court, and in which the elements of damage were of such indeterminate character that there was no criterion for segregation. In view of the manifest merit of the practice, we are not prepared to hold that it may never be adopted in any case where the verdict is based on these indeterminate elements; it may sometimes clearly enough appear from the whole record that the damages resting on the erroneous foundation cannot be more than a certain amount and that there can be no injustice in providing that the verdict may stand if the plaintiff will remit that amount. However this might be, we think the present case is not one of those where such a remittitur can be permitted. We would be compelled to estimate three fractions: First, what portion of the whole damages was represented by the verdict after a proportionate deduction on account of contributory negligence; second, what portion of the verdict was considered as damages to the widow; and, third, what portion of these damages to the widow was for loss of society as distinguished from loss of support. The problem would be one degree less difficult for us to solve if, as directed in Railway v. McGinnis, 228 U. S. 173, 33 Sup. Ct. 426, 57 L. Ed. 785, damages had been apportioned among beneficiaries. As the record stands, to sanction a reduction in the judgment now and so to cure the error in the charge would require us either to find an unknown fraction of an unknown portion of an unknown whole, or else to allow so liberally for these uncertainties as to put upon the plaintiff a greater and more unjust burden than is imposed by the award of a new trial.

The judgment below is reversed, and the case remanded for a new trial pursuant to this opinion.