## GRANITE BRICK CO. v. TITUS.

(Circuit Court of Appeals, Fourth Circuit. February 5, 1913.)

### No. 1,116.

CORPORATIONS (§ 189*)—ACTION BY STOCKHOLDER—PRELIMINARY INJUNCTION—DISCRETION.

Defendant corporation, being in need of funds, procured the same from T. under an agreement, ratified by the stockholders, that he was to be paid his advancements in cash or given the right to take payment in stock at the rate of two for one. Stock was issued in consideration of such advancements, and at the annual meeting of the company in September, 1911, such stock was permitted to vote. Complainant, having advanced some $70,000, refused to advance more, except on the acceptance of certain propositions, which at a stockholders' meeting were refused, and a resolution passed directing the issuance of bonds to evidence a new loan for $50,000 to be secured by a mortgage on all of the company's property, on which question complainant's stock was not allowed to vote. In a suit to restrain the issuance of the bonds, the corporation answered that complainant's stock was a fictitious issue, in violation of the statutes of the state, and, being ultra vires, was properly refused the right to vote. *Held* that, under such showing, it was not an abuse of the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

trial court's discretion to issue a preliminary injunction restraining the issuance of the bonds pendente lite.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 706–722; Dec. Dig. § 189.*]

Appeal from the District Court of the United States for the District of South Carolina, at Charleston; Henry A. M. Smith, Judge.

Suit by Edward H. Titus against the Granite Brick Company. From a decree granting a preliminary injunction, defendant appeals. Affirmed.

J. B. S. Lyles, of Columbia, S. C. (D. W. Robinson and Lyles & Lyles, all of Columbia, S. C., on the brief), for appellant.

Robert W. Shand and B. L. Abney, both of Columbia, S. C. (Shand & Shand, of Columbia, S. C., on the brief), for appellee.

Before PRITCHARD, Circuit Judge, and WADDILL, District Judge.

PRITCHARD, Circuit Judge. This is an appeal from an interlocutory order of injunction of the United States District Court for the Eastern District of South Carolina, in equity, whereby it is ordered that:

"The Granite Brick Company, its attorneys, agents, servants, and employés, be and they are hereby restrained and enjoined from executing any mortgage on its property to secure the bonds referred to in the bill of complaint herein, or any other indebtedness."

The action in which the order was issued was commenced against the Granite Brick Company and the Columbia Savings Bank & Trust Company as defendants. F. H. Hyatt was not made a party defendant. The learned judge who heard this case in the court below, among other things, made the following statement of facts:

"From the written documents produced in the case it appears that the Granite Brick Company, of which F. H. Hyatt was president, had been carrying on business, but had not been operated at a profit, but, on the contrary, had been operated at a considerable loss. In this condition, Frederick H. Hyatt, the president, made certain representations to the complainant, Edward H. Titus, respecting the business, upon the strength of which the said Titus agreed to subscribe and pay for enough of the preferred stock unissued to make the total amount of such stock issued 1,000 shares. As to these representations, there is a conflict of testimony between Titus and Hyatt; but it is not necessary to pass upon the correctness at this time of the respective statements of either on this point. Titus did, in pursuance of his agreement, subscribe for 200 shares, of the par value of $100 per share, which amount was paid up in cash. It is claimed by Titus that although this was a written agreement, yet the understanding was that he was simply to loan this money, and to be entitled to take stock in payment for it if he desired to do so. The written document, however, is for a simple subscription, and the matter would be controlled by the written document, except for the fact that subsequently, on July 20, 1911, and September 20, 1911, the stockholders of the company did by resolutions duly passed accept the view of Titus, and agree that as to the amount advanced under this subscription agreement he was entitled to stand as a creditor, or at his option to take payment in stock at the rate of two for one. Titus went on and advanced a good deal of money, and in March, 1911, the directors of the company passed resolutions reciting that at the time Titus agreed to make

his advances the company was not making and had not made any profit, but had been operated, when at all, at considerable loss, and the stock of the company theretofore issued and outstanding was of the value of much less than its face or par value, and that the company, in recognition of the valuable assistance so rendered by Titus, and in justice to him, and in order to start the company free of debt, offered him stock of the company for the money furnished by him, whether advanced or to be advanced, on the basis of two shares, of the par value of $200, for every $100 so furnished by said Titus, provided said Titus was willing to take payment on such basis.

"Titus continued to advance; but, there being some doubt in his mind as to whether these resolutions were explicit enough, he desired them made so, and at a stockholders' meeting held on the 20th of July, 1911, it was unanimously resolved by the stockholders that it was the sense of the stockholders that the right and privilege given to Titus of taking stock in lieu of money advanced by him as adopted at the directors' meeting of March 27, 1911, should be ratified, and that it was the *understanding* and meaning of that resolution and of the stockholders that the said Titus was to have the option of taking for all moneys advanced or paid or liabilities incurred for the corporation payment either in money or in stock, and if taken in stock that he should have the right to two shares of stock, of the par value of $200, for every $100 of money so paid, and that that agreement should apply to all moneys paid or advanced, or liabilities incurred by said Titus, whether theretofore marked subscription to stock or not, and that the stock should be issued to him forthwith on that basis, with the privilege to said Titus of holding said stock as collateral security to such indebtedness, and with the power to vote said stock during the time he holds it. No stock held by Titus issued under the resolutions passed by the directors in March, 1911, appears to have been voted at this meeting of stockholders. In accordance with this action stock to the amount of 1,179 shares was issued to him. At a succeeding stockholders' meeting (the regular annual meeting) held September 20, 1911, the resolutions of the directors passed 27th of March, 1911, and of the stockholders passed July 20, 1911, were again ratified and approved. At the annual meeting held 20th of September, 1911, the stock issued to Titus under these resolutions was recognized and allowed to vote. The total advances made by Titus to the company to the 10th of November, 1911, was some $70,012.95. On the 20th of September, 1911, Titus stated at both the meeting of the stockholders and the meeting of the directors held that day that it would require $6,000 to pay the company's then outstanding obligations, and that if he indorsed for that sum additional to what he had already advanced he would not be willing to indorse for any other sums, and notified the company that if the company did not show a definite prosperity by November 10th next he would wish his money repaid. On November 10, 1911, a stockholders' meeting was held, followed by other meetings of the stockholders, culminating in a refusal of the company (the stock held by Titus not voting) to accept any propositions submitted by Titus for the adjustment and payment of the debt to him, and on December 27, 1911, resolutions were passed directing a mortgage to be issued and bonds sold for a new loan of $50,000. These resolutions were not voted on by the stock held by Titus as collateral security. At a subsequent meeting of the stockholders of the company held in February, 1912, the board of directors was enlarged, and new members giving control to the stock outside of Titus elected, and although the stock held as collateral by Titus was present and desired to vote, it was at the meeting excluded from voting by the vote of a minority of the whole stock issued (the stock held by Titus not being allowed to vote).

"The practical recapitulation of the facts shows that the complainant, Titus, having been approached by the president of the Granite Brick Company, when it had been operating at a loss, agreed, under representations made by its president, to subscribe or advance certain money under an agreement thereafter construed by the company simply to be an agreement to advance money with the option of taking payment if he saw fit in stock at the rate of two for one; that stock at this rate was issued to him as collateral security for his advances, and that when he had advanced about $70,000, and stated that

under the company's prospects he was not willing to advance more, the company concluded to and did pass resolutions to mortgage its property and issue bonds to the extent of $50,000, and arbitrarily excluded him or his representative from voting the stock held by him as collateral security at the stockholders' meeting (notwithstanding that the stock had been issued and the express agreement of the other stockholders on the 20th of July, 1911, and 20th of September, 1911, to permit him to vote it), at which meeting he could have prevented the issue of the bonds and mortgage by voting the stock held by him against it. In other words, the vote to issue the bond and mortgage, if this stock held as collateral security was entitled to vote, was determined by a minority of the stockholders. Titus therefore stands in the position of having advanced his money, and of now being not only by the company's determination about to have $50,000 of debt on the company's property put ahead of his, but with the company's notification that the stock issued to him, and held by him as collateral security, is absolutely null and void, and that he can only stand as an open account creditor of the company, with this large bonded indebtedness ahead of him. Titus does not seem to have taken advice of counsel in this matter. The secretary of the company and its apparent legal adviser was Mr. D. W. Robinson of Columbia, a lawyer of excellent standing and large practice. He was present at the meetings held 20th of July, 1911, and 20th of September, 1911, and himself proposed the resolutions passed on the 20th of July and ratified September 20, 1911. He as secretary put his name to the stock issued to Titus, and Titus, therefore, acting, if he did, on the assumption that Mr. Robinson was a lawyer who knew his business, might well have presumed that the stock was regularly issued, and issued by a company who had a right to issue it, and he was justified in accepting it as such.

"The position of the defendant company is that the stock was issued in contravention of the statute of South Carolina, which forbids the fictitious issue of stock, or the issue of stock except for value, and that the entire issue of stock held by Titus is null and void. The company claims that, this stock issue being ultra vires and void, the company is in the control of the other stockholders (who would be in the minority if the stock held by Titus could be voted), and has the same right as any other corporation or individual would have to mortgage its property to raise money. The defendant company further claims that the resolutions passed by the company at the stockholders' meeting held 15th of December, 1910, amounted to a contract on the part of Titus to furnish enough money to properly finish and complete the plant and equipment of the company, and that the present condition of the company is due to the mismanagement of Titus; he having been placed in practical charge and control of the construction work and operation of the company."

There are several assignments of error, but the main question to be determined is as to whether the court below was justified under the circumstances in issuing a temporary restraining order. The evidence was submitted, and after a careful consideration the court said:

"The only question presented at this preliminary hearing is whether a sufficient case has been made under the principles governing the issue of temporary injunctions by courts of equity to call for the maintenance of an injunction so as to maintain the status quo until a final decree can be had. It is the opinion of the court under the facts and issues found that such sufficient case has been made, and a formal order for a temporary injunction will accordingly be made, but wholly without prejudice to or indication of any conclusion of law or fact the court may reach upon the hearing upon the merits."

It was incumbent upon the judge in the court below to consider the allegations of the bill, together with the return, and then, in the light of the facts before him, determine whether, under the law, it was his duty to grant a temporary injunction. From the statement

of the learned judge who tried this case below (which we quote), it appears that he gave this matter a patient hearing, and after a careful consideration of the facts and the pleadings was of the opinion that a temporary injunction should be granted. It should be remembered, however, that the decision of the court below was without prejudice to the rights of the defendant, and was not intended to have any bearing whatever upon the questions of law or fact in so far as the merits of this case are concerned.

The Circuit Court of Appeals for the Sixth Circuit in the case of Bissel v. Goshen, 72 Fed. 549, 19 C. C. A. 29, in referring to this question, said:

"Where a preliminary injunction is allowed upon a prima facie showing and without the determination of the merits, this court will ordinarily on an appeal consider only the question as to whether, on the prima facie case made, there has been an abuse of discretion. Such preliminary injunctions are intended only to operate pendente lite or until a hearing on the merits can be had. They are granted by a mere summary showing upon affidavits. Their issuance is not a matter of right, and rests in the sound discretion of the judge."

Also in the case of Mayor v. Africa, 77 Fed. 501, 23 C. C. A. 252, Judge Lurton, again speaking for the Circuit Court of Appeals for the Sixth Circuit, adopts the rule announced in that case and quotes with approval the foregoing statement.

It is insisted that the court below erred in failing to accept the allegations of the return as true, notwithstanding the fact that they were opposed to those of the bill on the same subject. It should be remembered that the court was required to pass upon the averments of the return as well as those of the bill, and after a careful consideration reached a conclusion as to the same which we are not prepared to say was erroneous. We have carefully considered the bill, the return, and the evidence bearing upon the same, and, in view of the decisions just quoted, as well as the general rule bearing upon this subject, are of the opinion that there was no abuse of discretion by the court below. Under the circumstances, we think the action of the court in granting the temporary restraining order was eminently proper.

There were questions raised by the complaint and answer that were not passed upon or even considered by the court below; nor do we think that, for the purposes of determining the merits of the motion, it was necessary for the court to have passed upon these questions.

For the reasons stated, we are of the opinion that the decree of the lower court should be affirmed.

Affirmed.