### GRANITE BRICK CO. et al. v. TITUS.

(Circuit Court of Appeals, Fourth Circuit. September 14, 1915.)

#### No. 1307.

1. CORPORATIONS ⬥519—ACTIONS—EVIDENCE—SUFFICIENCY.

In a suit against a corporation, evidence *held* insufficient to show that complainant, who loaned the company money, conspired to wreck it.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2085, 2088–2089, 2091, 2093; Dec. Dig. ⬥519.]

2. COURTS ⬥324—FEDERAL COURTS—JURISDICTION.

In an equity suit brought in federal court on the ground of diversity of citizenship, an objection to jurisdiction because complainant, a holder of shares in the defendant corporation, failed to seek relief through the corporation, must be raised by demurrer.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 882–884; Dec. Dig. ⬥324.]

3. APPEAL AND ERROR ⬥1099—LAW OF CASE.

Where defendants' objection to the jurisdiction was presented by the record, an affirmance of a temporary injunction must be considered as establishing the law of the case against the objection, although the objection to the jurisdiction was not considered in the opinion.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4370–4379; Dec. Dig. ⬥1099.]

4. CORPORATIONS ⬥201—RIGHT TO VOTE STOCK—EQUITY JURISDICTION.

Where complainant had loaned money to a corporation under an agreement that he should receive shares of stock as collateral security, that he should be entitled to vote such shares, and that, if desirous, he might accept them in payment of the debt, he is entitled to equitable relief where

the other shareholders who were intending to mortgage the property of the corporation refused him permission to vote his stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 765, 766, 774, 775; Dec. Dig. ☞201.]

5. CORPORATIONS ☞99—POWERS OF—STOCK.

A corporation, in the absence of any statutory provisions, may pledge its unissued stock as collateral security for money advanced.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 444–446; Dec. Dig. ☞99.]

6. CORPORATIONS ☞197—PLEDGES OF STOCK—RIGHTS OF PLEDGEE.

A pledgee of corporate stock held as collateral security for money loaned the corporation is entitled to vote the stock, particularly where it was so agreed at the time of the loan.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 747, 749–764; Dec. Dig. ☞197.

Rights and liabilities of pledgees of stock, see note to Frater v. Old Nat. Bank, 42 C. C. A. 135.]

7. CORPORATIONS ☞99—ISSUANCE OF STOCK—VOID ISSUE.

Const. S. C. art. 9, § 10, declares that stocks and bonds shall not be issued by any corporation save for labor done or money or property actually received or subscribed, and all fictitious increases of stock shall be void. Civ. Code S. C. 1912, § 2799, is in essentially the same terms. A corporation which needed money to carry on its business borrowed from complainant, pledging with him unissued corporate stock as security. The agreement authorized complainant to vote the stock, and gave him an option, if he desired, of taking the stock in payment; it being issued at the rate of two shares of the par value of $200 for each $100 of money lent. The stock at that time was depreciated. *Held* that, as complainant refused to accept the stock in payment of his debt, the issue was not ultra vires, and shareholders could not object; the stock being issued for money paid.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 444–446; Dec. Dig. ☞99.]

8. CORPORATIONS ☞99—PLEDGE OF UNISSUED STOCK—EQUITABLE ESTOPPEL —WHAT CONSTITUTES.

In such case, though the stock was not fully paid in, yet, all of the shareholders of the corporation having agreed to the transaction, they are estopped from questioning the issue under Civ. Code S. C. 1912, § 2851, declaring that no stock shall be issued by any corporation until fully paid; that section not declaring that the stock shall be void.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 444–446; Dec. Dig. ☞99.]

9. EQUITY ☞39—JURISDICTION.

Where a court of equity acquired jurisdiction of a suit by complainant, who had been denied the right to vote shares of corporate stock which he held as collateral security, the court will administer the equities of the parties, notwithstanding the rule that a simple contract creditor having no lien upon or interest in the property of a corporation cannot, in the absence of a trust relation, invoke the equitable jurisdiction of the court, would otherwise have applied to complainant.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 104–114; Dec. Dig. ☞39.]

10. EQUITY ☞42—OBJECTIONS TO JURISDICTION—WAIVER.

Objections that the court of equity did not have jurisdiction over a suit should be raised at the earliest possible moment, for such defense may be waived.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 119, 120; Dec. Dig. ☞42.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

11. EQUITY ⬡⟶42—JURISDICTION—OBJECTION—WAIVER.

Where defendants' demurrer raising a jurisdictional question was overruled, and, after the order granting temporary injunction was affirmed on appeal, defendants filed an answer and cross-bill which did not raise such matters, any objection was waived.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 119, 120; Dec. Dig. ⬡⟶42.]

Appeal from the District Court of the United States for the Eastern District of South Carolina, at Columbia; Henry A. M. Smith, Judge.

Bill by Edward H. Titus against the Granite Brick Company and another. From a decree for complainant, defendants appeal. Affirmed.

Wm. H. Lyles and D. W. Robinson, both of Columbia, S. C. (Lyles & Lyles, of Columbia, S. C., on the brief), for appellants.

Robert W. Shand and B. L. Abney, both of Columbia, S. C. (Shand, Benet, Shand & McGowan, of Columbia, S. C., on the brief), for appellee.

Before KNAPP, Circuit Judge, and WADDILL and CONNOR, District Judges.

CONNOR, District Judge. Appeal from decree for plaintiff and dismissing defendant's cross-bill. The District Judge, in his opinion in the record, found the facts. Plaintiff alleged: That the defendant Granite Brick Company was chartered under and pursuant to the laws of South Carolina, for the purpose of making and selling, what it alleged to be, a superior quality of brick. That on, or about, September 15, 1910, on representation made to him by F. H. Hyatt, president, of the valuable shale and clay deposits, belonging to the company, adapted to the manufacture of vitrified brick, and on other statements made in the prospectus issued by the company, and by said Hyatt, plaintiff was induced to sign a subscription for 200 shares of the capital stock of the corporation, at and for the sum of $20,000, which was, in fact, intended as a memorandum of a sum agreed to be loaned to said company. That notes were executed by the president and secretary of the company for the amounts advanced. That said notes were thereafter marked paid upon the issue of certificate of stock as security for the money so advanced. That thereafter, at various dates and pursuant to the agreement made with the company, set out in resolutions adopted at meetings of the stockholders and directors, which resolutions are set forth in the bill, and for the purpose of enabling said company to complete and operate its plant, he advanced large sums of money to said company. That, for the purpose of securing to him the payment of said sum, so advanced, the company, pursuant to its contract and agreement made with him, issued certificates of its stock, aggregating 1,179 shares, to be held by him as collateral security, with the option to him, if he should so decide, to hold the said stock in discharge of such loans. That at a meeting of the board of directors, held June 26, 1911, it appeared that the company then owed plaintiff $35,000, upon notes and open accounts, and a further sum of $5,000, upon

a note indorsed by plaintiff. That the sum of $6,000 was needed to complete the plant. Plaintiff stated that he desired to limit the amount which he would advance to $50,000. At a meeting of the stockholders, held July 20, 1911, it was resolved:

"That it is the sense of the stockholders, that the resolution contained in the minutes of the directors' meeting of March 27, 1911, in regard to giving Mr. Edward H. Titus option and privilege of taking stock in lieu of money advanced by him, be ratified; that it is the understanding and meaning of said resolution, and of the stockholders' meeting, that said Edward H. Titus is to have the option of taking for all moneys advanced or paid, or liabilities incurred for the corporation, with the option of taking payment of said notes either in money or in stock, and if taken in stock, that he shall have the right to two shares of stock of the par value of $200, for every $100 of money so paid or advanced, or liability incurred; and that this shall apply to all moneys paid or advanced, or liabilities incurred by said Edward H. Titus, whether heretofore marked subscription to stock or not. That stock shall be forthwith issued to him by said corporation, upon said basis of two shares of stock of the par value of $200 for each $100 so advanced or paid, or liability incurred by him, with the privilege of holding such stock as collateral security to such indebtedness and with the power to vote said stock during the time he holds it."

That at a meeting of the board of directors, held on the same day, pursuant to said resolution of the stockholders, stock was issued to plaintiff at the rate named therein, which was, at the time of filing his bill, held as collateral security. That thereafter plaintiff made further advances to said company and received stock as collateral security therefor. That the president and secretary executed to plaintiff the notes of the company for all of said amounts. An itemized list, with dates and amounts, are set forth, aggregating, November 1, 1911, $61,-972.95. That since said date he has been required to pay two notes aggregating $7,500 of the company, indorsed by him. That, becoming convinced that the further development of defendant's plant was impracticable, without additional funds, which plaintiff was not willing to furnish, and which the company was unable to secure, from any other person, and having learned that the representations, on the faith of which, believing them to be true, he had advanced the said sums, were misleading and untrue, he called for some settlement of the notes held by him, then past due. That liberal offers for settlement were made by him, as appears by the minutes of the meetings of stockholders, all of which were rejected. That, claiming that the issuing of said shares of stock as collateral security, for the money thus borrowed from plaintiff, was ultra vires, the officers of the company have undertaken to disavow their action and refuse to recognize the validity of said stock, and to hold meetings, pass resolutions, amend the charter, and issue bonds, secured by a mortgage on the property of the company upon the assumption that the stock issued to complainant is invalid. That, on December 21, 1911, at a meeting at which complainant's stock, although represented, was excluded from voting, a resolution was adopted authorizing and empowering the board of directors to issue bonds and execute a mortgage on said property. That at a stockholders' meeting, held on February 3, 1912, plaintiff was excluded from voting the stock issued to him, pursuant to the resolutions above set forth, having been given to him as collateral security

for the loans made by him, and upon which he made said loans. With the remaining stock, of which the president, F. H. Hyatt, owns a very large majority said meeting adopted a resolution by a minority of stock vote, for an issue of $50,000 in bonds, secured by a mortgage on its entire plant for the purpose of obtaining money for its use and excluding plaintiff from receiving any part of the proceeds thereof. At said meeting a minority of the stockholders assumed to elect three directors, who are now in office, thereby creating discord and confusion to the great injury of the corporation. That, acting under the said pretended authority of the stockholders' meeting, the corporation is about to issue $50,000 in bonds of said company and to execute a mortgage on its entire plant, to secure the payment therefor, with the intention of selling said bonds, or of negotiating a loan by depositing them as collateral security therefor. Complainant is informed and believes that it is the purpose of said corporation to use no portion of the proceeds of said bonds, in paying his claim or part thereof. Complainant further alleges that the corporation is insolvent and has been sued, on several debts.

He makes further allegations regarding the management of the affairs of the corporation, all of which he avers are wrongful and injurious to himself and his rights as a stockholder and creditor. He prayed that the company be enjoined from issuing the bonds and executing the mortgage on its property, and for general relief.

Upon the filing of the bill, service of subpœna, and upon notice, the judge made a temporary restraining order, enjoining defendant company from incumbering its property, with an order to show cause why a temporary injunction should not issue. Upon the return of this order and hearing, an injunction was issued, and upon defendants' appeal the order of the judge was affirmed. Granite Brick Co. v. Titus, 203 Fed. 659, 122 C. C. A. 55.

Defendant filed a demurrer which was overruled, whereupon defendant filed an answer, to which plaintiff filed its replication. Defendant, by leave of the court, filed a cross-bill. The matters and things set up and relied upon by defendant in its answer and cross-bill are substantially the same, the purpose of the cross-bill being to obtain affirmative relief. Defendant denies that plaintiff was misled by any representations of its president, in regard to the value of its property, or of the quality and value of the brick which it proposed to manufacture. It alleges that plaintiff subscribed and paid for 200 shares of its stock, and denies that, at the time he did so, there was any agreement that the amount paid was to be regarded as a loan, or that plaintiff was to have the option of so treating his subscription. It admits the adoption of the several resolutions by its stockholders and directors set out or referred to in the bill and, in regard thereto, avers that plaintiff entered into an agreement with defendant, whereby he agreed to lend, or to secure for it, upon notes indorsed by him, whatever sum might be necessary to complete and equip its plant, the repayment of said sums to be secured by notes of defendant, with an option to plaintiff to take payment therefor, in stock of the defendant. That plaintiff entered upon the performance of his part of this agreement and subsequently

undertook to supervise, design, and erect a plant suitable for the purposes of defendant, the erection of which was to be paid for by plaintiff, out of the funds advanced by him. That, at the request of plaintiff, and to allow him full opportunity to perform his agreement, certain of his friends were elected directors, and an executive committee was appointed with full authority to act for the corporation, that plaintiff's friends were elected on the committee, and thereby the entire charge and management of the corporation was vested in plaintiff, upon the trust and in the confidence that he properly use and expend the funds which he agreed to lend the company in the erection of a proper and suitable plant and in the development of the company's business. That plaintiff soon ascertained that the property owned by defendant was very valuable and conceived the idea of abusing the trust and confidence that had been placed in him so that he might acquire the same at a greatly depreciated price. That thereupon plaintiff conspired with one Mallow, whom he had placed in practical charge of the corporation, to bring the defendant into financial straits and into such embarrassment as would enable the plaintiff to acquire its property and enterprise at much less than its real value. That the resolution set forth in the complaint was passed by the predominating influence of plaintiff and his associates as a step towards the accomplishment of the conspiracy, and as a malicious effort to injure the property of defendant. Defendant denies that it was within the power of its board of directors to pass such resolution and denies that such resolution was duly passed, etc. Defendant admits the passage of the other resolutions set out, or referred to, in the bill, but avers all of said resolutions were passed by means of the fraudulent conspiracy of plaintiff and his associates, and in furtherance of his plan and purpose to wreck defendant and secure its property at less than its value. Defendant admits the execution of the notes held by plaintiff and avers that they were acquired by him in pursuance of the said conspiracy. That plaintiff, after securing the said notes and the certificates of stock, upon his promise to furnish sufficient capital to complete and equip its plant, and start same in operation, maliciously failed and refused to complete and equip the plant, but, on the contrary, has made every effort and taken every possible step to retard and ruin the completion and equipment of the plant and the development of the defendant's business and thereby, in furtherance of said conspiracy, to secure the property at less than its real value. That defendant's board of directors were under the complete domination and influence of plaintiff, and that defendant has not the means of knowing whether plaintiff has actually advanced and invested in defendant's plant the amount claimed by him. Defendant denies that, at any of the meetings of its stockholders, plaintiff has been denied the right to vote any shares of stock legally issued to him, or that the resolution to issue the bonds and execute the mortgage referred to was adopted by a minority of the stockholders.

It further denies that it is the purpose of defendant to use no portion of the proceeds of the sale of the bonds to pay plaintiff's claim, or any part thereof. It denies that it is insolvent. In the cross-bill defendant sets out essentially the same matters and things set out in its

answer and demands damages for the injury which it avers it has sustained by the conduct of plaintiff and for other affirmative relief. Plaintiff filed answer to the cross-bill. A reference was made to the standing master to take proof as to all the issues in said cause, arising upon the pleadings. The report of the master contains a very full and exhaustive examination of witnesses and a very large number of exhibits showing the correspondence between plaintiff and the president of defendant, the minutes of meetings of stockholders and directors, the advancement of sums of money by plaintiff to defendant, by checks and otherwise, defendant's notes to plaintiff and issues of stock to plaintiff. Prior to the coming in of the report, an order was made by the judge, with the consent of defendant, appointing a receiver of defendant's property, enjoining all other persons from suing defendant, and directing all other creditors to file their claims in this cause. Upon the coming in of the report and hearing thereon, the District Judge, in a carefully considered opinion, set forth his conclusions of fact and of law. He found that:

"Under the resolutions, the contract and agreement between the complainant and the company was that the complainant, for all such money as he might have, at any time, advanced, or should advance, was to have the option, either of requiring repayment thereof, by the company, or of receiving payment in stock at the rate of two shares of stock of the par value of $200 for every $100 of money so advanced by him; that if he preferred not to take the stock, but to require payment of the money advanced, then he should be entitled so to require. In the meanwhile, as collateral security, to secure the payment of the money advanced by him for the purpose of the company, until he should exercise his option, stock was to be issued to him on the basis before mentioned, as the basis on which he could receive payment on the same, which stock was to be held by him as collateral security for the indebtedness due him, with the privilege and power of voting the stock during the time he held it.

"Prior to the institution of these proceedings, Titus notified the company that he preferred not to take the stock, but would require payment to him of the money advanced. In other words, he notified the company that he declined to exercise the option of becoming a stockholder and preferred to retain the position of a creditor as against the corporation. The exact date when this notification was conveyed to the company on behalf of Titus is a little uncertain, but there is no doubt that, on December 15, 1911, at the stockholder's meeting, then held, the company was duly notified formally that Titus would not exercise his option of being paid, in stock, but would stand on his position as a creditor.

"The court finds, as a conclusion of fact, that this was the agreement between the company and the complainant, E. H. Titus; that Titus fully performed his part of the agreement for which he was entitled to repayment from the company."

The judge further finds that the president and treasurer was Mr. F. J. Hyatt and the secretary Mr. D. W. Robinson. Both were members of the board of directors. Both were present at the director's meeting March 27, 1911, and at the stockholder's meeting held July 20, 1911, and September 20, 1911. The resolutions making the agreement with Titus passed at the meeting of March 27th, and July 20th, were made upon the motion of Mr. D. W. Robinson. The notes given to Titus in recognition and acknowledgment of his debt as for money due by the company are signed on behalf of the company by both Hyatt and Robinson. The stock issued to Titus, under the agreement, is sign-

ed by both Hyatt and Robinson. Mr. Hyatt is a successful business man, of widely respected intelligence. Mr. Robinson is a lawyer in the best standing. Both are men upon whose character the complainant or any one else might absolutely rely. The defendant the Granite Brick Company now maintains that the agreement on the part of the complainant was to advance and continue to advance indefinitely whatever sum, no matter how great, as might be necessary to complete and equip the plant the company, at that time, contemplated erecting on its property. It contends further that the passage of the resolutions relied upon by Titus as embodying his agreement with the company were procured by fraudulent and undue influence of the complainant in pursuance of an illegal conspiracy on the part of the complainant and others to wreck the defendant company, so as to acquire its property at much less than its real value.

Upon the first point the text of the resolution is directly against the contention of the company. And the plain construction of this text is corroborated and acted upon in the actions of the company's officers, Messrs. Hyatt and Robinson, in issuing the stock and signing the notes given to the complainant. There is no evidence that Titus ever entered into or contemplated entering into an agreement of the loose and ruinous (to him) character set up by the defendant.

On the second point the court finds no evidence on the part of Titus of any such fraudulent conspiracy. To reach the conclusion that the resolutions were passed and the stock and notes issued to Titus by Hyatt and Robinson, by reason of any fraudulent and undue influence over them, would involve, under the testimony in this case, a criticism of either their characters or intelligence, that there is nothing in the record to constrain the court to even consider.

The judge found that the amount due plaintiff by defendant is $70,222.95, with interest from December 15, 1911, and that the defendant is insolvent. A decree was made in accordance with the opinion of the judge, and pursuant to its provisions the property of defendant was brought to sale, which was duly confirmed.

[1] Defendant filed a large number of assignments of error, many of which are directed to the conclusions of fact. An examination of the testimony and the exhibits, all of which, it is manifest, were carefully considered by the learned judge, amply supports the conclusions to which he arrived in regard to the course of dealing between the complainant and the defendant company. Whatever may be thought of the soundness of judgment exhibited by complainant, in advancing to defendant the sums of money, in regard to which there is no substantial controversy, and undertaking otherwise to aid the company in developing and putting upon a paying basis, its operations, it is difficult, if not impossible, to find in the evidence any evidence of conspiracy to wreck and acquire its property. He seems to have been the only person connected with the enterprise from "start to finish," who has shown his faith in the representations made by the president, and his optimistic attitude, by putting real money into it. It is perfectly manifest, from the language used in the resolutions prepared and introduced by Mr. Robinson and adopted unanimously

by the stockholders, that the other stockholders had not paid full value for their stock. A perusal of the history of the organization, and management of the corporation, prior to the time when plaintiff began to have dealings with it, does not lead to the conclusion that any of the parties holding stock had invested very much money in it. It is manifest that the recitals in the several resolutions, that it had been operated at a loss, were correct. We concur in the conclusion to which the learned judge arrived in regard to the facts. We are thus brought to a consideration of the assignments of error in regard to his conclusions of law.

[2-4] In the twenty-fourth and twenty-fifth assignments of error the jurisdiction of the court is challenged. In appellant's brief, this contention is based upon two propositions:

That in so far as plaintiff bases his right to invoke the equitable jurisdiction of the court, for alleged threatened injury to his rights as a stockholder, he has not brought himself within the provisions of equity rule 27, formerly 94, in that he does not, as required by said rule, allege that the suit is not a collusive one to confer jurisdiction on a court of the United States, nor does he set forth with particularity the efforts of the plaintiff to secure action on the part of the directors, and also the shareholders and the cause of his failure to obtain such relief. Hawes v. Oakland, 104 U. S. 450, 26 L. Ed. 827. The jurisdiction of the court is founded upon the diversity of citizenship. Plaintiff is a citizen and inhabitant of New York, and defendant is a South Carolina corporation. The right, under these conditions, and upon the facts alleged in his bill to invoke the equitable powers of the court, is another question. This objection must be raised by demurrer. Illinois Cent. R. R. Co. v. Adams, 180 U. S. 28, 21 Sup. Ct. 251, 45 L. Ed. 410. This was done by defendant, and the refusal of the judge to sustain the objection was made the basis of appeal. While the opinion affirming the action of the court does not refer to the point now sought to be made, it was presented upon the record and must be regarded as the "law of the case." 203 Fed. 659, 122 C. C. A. 55. If, however, the question was open, we are of the opinion that the objection cannot be sustained. It amply appears that plaintiff sought to protect his rights as a stockholder by offering to vote, which was by the unanimous vote of every other stockholder denied him. It is manifest that he had no avenue of relief open to him other than an appeal to a court of equity.

[5-8] It is further insisted that the issue of stock to plaintiff as collateral security was ultra vires, and that therefore plaintiff's only status in the court is that of a simple contract creditor; that, as such, he could not maintain, either in his own behalf, or in behalf of himself, and of all other creditors, a creditor's suit in the court of equity. For this, defendant relies upon Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. 712, 35 L. Ed. 358; Hollins v. Brierfield Coal & Iron Co., 150 U. S. 371, 14 Sup. Ct. 127, 37 L. Ed. 1113. This contention, of course, is based upon the proposition that, in issuing the stock to plaintiff, as collateral security for the amount advanced to him, the corporation, the stockholders and directors were acting ultra vires, and this presents

the question whether the learned judge was in error in holding that the defendant corporation was estopped from making this defense. He says that:

"In equity, the company is now estopped from denying that the agreement between Titus and itself is valid and binding upon the company, and it follows that Titus is entitled to enforce the payment of the money due him under this agreement by the company. The attempt, on the part of the company, to give a mortgage to take precedence of this debt to Titus and the refusal to permit him to vote his stock at the meeting called for the purpose of authorizing the mortgage was a violation of the agreement with Titus. The very reason of giving the stock to hold as security, with the right to vote it, was to protect him from just such an action as this. It allowed Titus to' protect himself by voting against the creation of the mortgage and to that extent operated to give him security for his money loaned."

If this is a correct conclusion of law, the plaintiff was entitled to invoke the injunctive aid of the court to protect his rights; to prevent the violation of his right as a holder of stock as collateral security for his debt, by placing a mortgage on the property for an amount which, as now appears, was very much in excess of its value. The fact must be kept in view that this is not a controversy by creditors of the corporation against whose rights plaintiff is asserting any rights as a stockholder. It is, as found by the court, an attempt on the part of the corporation to repudiate its solemn corporate act, assented to by all of the stockholders at times, and at no time against the dissent of any, upon the faith of which it has secured from the plaintiff a very large sum of money. The learned judge below has found, and in this finding we concur, that plaintiff has not, in any of the transactions had with the defendant, been guilty of any improper or dishonest conduct; that the allegations of the answer and cross-bill regarding a conspiracy on the part of plaintiff and his associates to acquire defendant's property at less than its value are not sustained; and that he has on his part performed all of the obligations of the contract. It is equally clear that the stockholders, directors, and officers, in making the contract with plaintiff, passing the resolutions and issuing the stock as collateral security for the money advanced, were acting in good faith, and, for what they believed to be, the best interest of the company and promotive of the purpose for which it was chartered and organized. Their reason for extending to him the option to take the stock on a basis of two shares for $100 is manifested by the language of the resolution of March 27, 1911:

"And whereas, prior to and up to the time said funds were so furnished, the company was not making, and had not made, any profit, but had been operated, when operated at all,. at a considerable loss; and the stock of the company theretofore issued and outstanding, was of the value of much less than its face or par value. And the company, in recognition of the valuable services so rendered by Mr. Titus, and in justice to him and in order to start the company free from debt, desires to offer him stock of the company for the monies furnished by him on the same practical basis and real valuation of the stock held by the other stockholders at the time he undertook to assist the company."

This recital and the resolution following it was introduced by Mr. Robinson and adopted without dissent. It was expressly ratified at two stockholders' meetings, without dissent. In the light of the

history of the organization of the company, and the manner in which the stock then issued was paid for, it is not difficult to understand, and conclude that the recital was strictly true. Eliminating therefore all questions of fraud and conspiracy, the question is presented whether the agreement made between the plaintiff and the defendant in regard to the issue of stock as collateral security is valid; and, if not, whether the defendant company may, without returning to plaintiff the money which he loaned on the faith of its validity, repudiate its contract and thereby deprive the plaintiff of any relief in a court of equity. It must be kept in mind that the stock issued to plaintiff was within the amount authorized by the charter; it was unissued stock of the company, and the amount advanced by plaintiff was intended and used for installing and equipping the plant. That a corporation, in the absence of any statutory prohibition, may pledge its unissued stock as collateral security for money advanced to it, would seem to be well settled. Cook on Corp. § 465; Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10, 27 L. Ed. 359. Mr. Justice Bradley says:

"Though issued in form, it was only issued in a qualified sense, to subserve a specific purpose by way of collateral security for a limited period, and was returnable to the company when that purpose should be accomplished."

The holder of stock as collateral security for money loaned to the corporation is entitled to vote at a stockholders' meeting, especially when it is so agreed upon at the time the stock is issued and the money loaned. This constituted an essential element of its value as collateral. This is not seriously controverted by the defendant's counsel, but it is earnestly insisted that, because of provisions of the Constitution and statutes of South Carolina, the issue of stock in excess of the amount actually paid in is absolutely void. A number of authorities are cited to sustain, and which do sustain, many of the propositions announced by the learned counsel. The question respecting the validity of stock issued in violation of the constitutional and statutory prohibitions has been presented in many phases. In Altenberg v. Grant, 85 Fed. 345, 29 C. C. A. 185, plaintiff was seeking to recover damages for the breach of a manifestly illegal contract to issue to him stock of the par value of $235,000 in consideration of services valued at $20,000. The opinion of the court is conclusive against plaintiff's right to recover. No question of estoppel on the corporation was presented. The question is frequently presented in suits by creditors of insolvent corporations to compel the payment of the par value of stock illegally issued. In the instant case the plaintiff alleges, and the defendant concedes, that the stock was to be held only at plaintiff's option; if he were now seeking to exercise the option to hold the stock at its par value, that is, to hold 1,179 shares of paid-up stock for $70,222 actually paid in, a different question would be presented. He makes no such demand, but concedes that the stock was issued only as collateral security, with the option on his part to cancel his debt and hold the stock; he does not seek to exercise this option; he claims nothing but his debt. Conceding that, by reason

of the stringent provisions of the Constitution and statutes of South Carolina, he could not hold the stock without paying in the par value, does it follow that, when he is making no such claim, but simply asking that he be paid his debt, the solemn and oft-repeated assurance by all of the stockholders shall, at their election, be held invalid and the corporation retain the money secured upon the faith of such assurances, promises, and agreements?

The Constitution of South Carolina (section 10, art. 9) provides:

"Stock or bonds shall not be issued by any corporation save for labor done, or money or property actually received or subscribed; and all fictitious increase of stock or indebtedness shall be void."

Section 2799 of the Code of 1912 is in essentially the same terms. Section 2851 of the Code, so far as applicable to this discussion, provides that:

"No stock shall be issued by any corporation until fully paid, except in case of corporations when, by the terms of the petition, the capital stock is to be paid in instalments."

The constitutional provision was considered by Judge Simonton in Firth Co. v. So. Ca. Loan & Trust Co., 122 Fed. 569, 59 C. C. A. 73. There, the corporation, for purposes similar to those which moved the defendant, issued its bonds, and deposited them as collateral to notes executed to banks for a loan of money, used in paying for machinery. They were deposited in amounts exceeding the amount of the notes. In a controversy arising, in bankruptcy, between the unsecured creditors and the holders of the bonds, the objection was made that, under the provisions of section 10, art. 9, of the Constitution, they were invalid. Judge Simonton, writing for the court, said:

"As corporations issuing bonds may sell them bona fide below par, so in making a loan they may hypothecate bonds greater in nominal value than the amounts borrowed. The mere fact that the bonds were issued for more than the value of the notes thus secured does not of itself indicate fraud or create a fictitious indebtedness. * * * The property of the company was valued at $100,000. No exception has been taken to this. The amount of bonds issued was $75,000. So these bonds cannot be said not to represent substantial value. So, also, each transaction was a real one. Money was received on every pledge. It was based on a present consideration, the actual receipt of the money. The contract in each case had reference to a legitimate corporate purpose, obtaining the means by the pledge to complete the purchase of machinery for the purposes of the corporation. The money obtained on each transaction was actually used for this same purpose. There was here no device to evade the law or to accomplish that which was forbidden."

This language is singularly descriptive of conditions disclosed by this record. The constitutional provision applies to "stock or bonds." It has been held by the Supreme Court of New Hampshire, in Peterborough R. R. Co. v. Nashua Co., 59 N. H. 385, that unissued stock may be issued by the corporation as a pledge to secure a loan, and the corporation cannot set up that it was issued at less than par, in violation of the Constitution. The issue is good in the hands of the pledgee to the extent of the loan. Note Cook on Corp. § 465.

The issue of the stock to Titus cannot be correctly termed "fictitious." It is certainly not feigned, nor imaginary—counterfeit. It was evidently the opinion of Judge Simonton, concurred in by the other judges of the court, that the Constitution did not invalidate stocks or bonds of corporations because not sold or hypothecated for their par or face value; the language does not demand or reasonably sustain such construction. It will be observed that the Constitution of Kentucky, § 193, with which Judge Taft was dealing in Altenberg v. Grant, supra, provided that:

"No corporation shall issue stock or bonds except for an equivalent in money paid, or labor done, or property actually received and applied to the purposes for which such corporation was created, and neither labor nor property shall be received in payment of stock or bonds at a greater value than the market price at the time the said labor was done or property delivered, and all fictitious increase of stock or indebtedness shall be void."

There, stock was agreed to be issued for $235,000 for "labor done," which was said to be "a grossly inadequate consideration"—$20,000. The Constitution of South Carolina, § 10, art. 9, was construed by Judge Simonton to be "in every respect the same" as that of Arkansas, which was involved in Memphis v. Dow, 120 U. S. 287, 7 Sup. Ct. 482, 30 L. Ed. 595. It will be observed that there is a marked difference, as said by Judge Taft, between the language of the Constitution of Kentucky and that of Arkansas. The former prohibits the receipt of "labor done," or "property received * * * at a greater value than the market price at the time the said labor was done or property received"; and it was this limitation which was enforced in Altenberg's Case. In neither the South Carolina nor the Arkansas Constitution are these words found. Therefore, in the light of the Firth Case, the language of Judge Harlan in Memphis v. Dow, supra, is authoritative. Judge Harlan says:

"Recurring to the language employed in the Arkansas Constitution, we are of opinion that it does not necessarily indicate a purpose to make the validity of every issue of stock or bonds by a private corporation depend upon the inquiry whether the money, property, or labor actually received therefor was of equal value in the market with the stock or bonds so issued. It is not clear, from the words used, that the framers of that instrument intended to restrict private corporations—at least when acting with the approval of their stockholders—in the exchange of their stocks or bonds for money, property, or labor, upon such terms as they deem proper; provided, always, the transaction is a real one, based upon a present consideration, and having reference to legitimate corporate purposes, and is not a mere device to evade the law and accomplish that which is forbidden."

If, under the provisions of the Constitution, bonds may be hypothecated, or issued, as collateral for notes, in excess of the amount of the notes, it is not easy to see why unissued stock, within the power of the corporation to issue, may not be used in the same way. The reason, or policy, which moved the makers of the Constitution and statutes, apply with equal force to both. If therefore the Constitution did not invalidate the stock issued as collateral because a larger amount at par was issued than the amount of the debt, it is manifest that the real value of the stock did not exceed the amount for which it was issued, and was not so regarded by the stockholders. The resolution of March 27, 1911,

so declares. The transaction, from this viewpoint, comes clearly within the principle announced in Ingraham v. Com. Lead Co., 177 Fed. (C. C. A., 8th Cir.) 341, 101 C. C. A. 317. There, the condition of the company's affairs being similar to those of the brick company, bonds were issued and, as a bonus to the stockholders who took them, an increase of stock was issued to each stockholder. The corporation becoming insolvent, creditors sued the stockholders for the amount of such stock as unpaid subscriptions. Adams, Circuit Judge, after describing the financial condition of the company and its inability to borrow money, by selling new stock on the market, says:

"Our conclusion is that the corporation received the fair and reasonable value in money for the increased stock issued to some of the defendants as bonuses for their loans."

In Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530, 35 L. Ed. 227, Mr. Justice Brown says:

"It frequently happens that corporations, as well as individuals, find it necessary to increase their capital in order to raise money to prosecute their business successfully, and one of the most frequent methods resorted to is that of issuing new shares of stock and putting them upon the market for the best price that can be obtained; and so long as the transaction is bona fide, and not a mere cover for 'watering' the stock, and the consideration obtained represents the actual value of such stock, the courts have shown no disposition to disturb it. Of course, no one would take stock so issued at a greater price than the original stock could be purchased for."

Without pursuing this branch of the case further, or citing the numerous decisions of courts more or less in point, we are of the opinion that, in issuing the stock to Titus, as collateral security, for the amount advanced by him on it, there was no violation of the provisions of the Constitution; it was issued "for money paid," and was therefore not fictitious and not void.

The provisions of section 2851 of the Code prohibit the issue of stock "by any corporation until fully paid." It will be observed that this section of the Code does not declare that stock, not fully paid, is void.

Assuming, pro hac vice, that this prohibition applies to stock issued as collateral security, as in the instant case, the question arises whether the stock is void, or only voidable, at the election of those who are injured as nonassenting stockholders, or creditors who are entitled to look to the proceeds of the stock sold, or issued for payment of their debts. If voidable, may the corporation so elect to treat it without returning the money advanced on the faith of its issue? In the absence of fraud, or mala fides, the issue of such stock is ultra vires. While the corporation is a legal entity, distinct from its stockholders, it is equally true that, where no creditors are concerned, and where there is no public duty imposed by reason of the purpose for which it is chartered, a corporation, for some purposes, is regarded, in a court of equity, as composed of its shareholders. In other words, the corporate entity theory may not be used as a means of committing, with impunity, a wrong.

"The theory of a corporation is that it has no powers except those expressly given, or necessarily implied. But this theory is no longer applied to private

corporations. A private corporation may exercise many extraordinary powers provided all of its stockholders assent and none of its creditors are injured. There is no one to complain except the state, and, the business being entirely private, the state does not interfere." Cook on Corp. § 3.

"The corporation may also, by consent of all, give away all corporate assets, and in a great variety of ways, by which directors and corporate officers make a personal profit out of the corporation, a profit which is fraudulent and illegal, if any stockholder objects, is legal and is upheld by the courts, if all the stockholders assent, or do not object." Id.

It is upon this principle that the courts hold that private corporations, when all of the stockholders have assented, or by conduct, acquiesced in, acts ultra vires, are estopped from repudiating such acts, where there is no fraudulent purpose and no creditor is injured.

In Dickerman v. Northern Trust Co., 176 U. S. 181, at page 202, 20 Sup. Ct. 311, at page 319, 44 L. Ed. 423, Mr. Justice Brown says:

"The very authorities which hold that the declaration that the stock is fully paid and unassessable is not binding upon creditors, also hold that the corporation cannot repudiate it and proceed to collect either from the person receiving the stock, or his transferee, the unpaid part of the par value. * * * There is no doubt that, if this were a suit by creditors to enforce payment of the unpaid portion of the stock subscription, the fact that the stock certificates declared that they were fully paid and unassessable would be no defense; but it is a suit of stockholders in the right of the corporation, and as between the corporation and its stockholders the declaration that the shares are fully paid up and unassessable is a valid one." Scovill v. Thayer, 105 U. S. 143, 26 L. Ed. 968; Cook on Corp. 38.

The principle involved is illustrated and applied in L. D. George Lumber Co. v. Daughtery, 214 Fed. 958, 131 C. C. A. 254. Woods, Circuit Judge, after stating the facts, showing a conversion of the property of one corporation into the assets of another, in violation of the statute of Virginia, says:

"But when the president in the corporate name, with the co-operation of all stockholders, undertook to embark all the corporate assets in a business venture, and in the prosecution of that enterprise obtained credit * * * on the faith of the corporate property, equity will not allow the corporation, in the interest solely of the stockholders, to assert that the corporate property is not liable."

Of the stock, other than that issued to Titus, Hyatt held 416, out of total of about 600 shares. The balance was distributed among a small number of persons. It was all represented, either in person, or by proxy, at the meetings held when the resolutions in regard to the transactions with Titus were adopted. Mr. Hyatt presided at each of them, and Mr. Robinson was present as secretary and introduced the resolutions. There is no suggestion of any dissent. It is evident that these stockholders are alone interested in the property. For the reasons so clearly stated by the learned District Judge, it is impossible to conceive or "even consider" the suggestion that they were dominated, or overreached, by Titus, or themselves intended any wrong. They owned all of the stock, and therefore all of the property, of the corporation. It is not claimed or suggested that there were any creditors to be injured by the course pursued. Whatever variant views in regard to the rights and obligations of corporations accruing from contracts made by them ultra vires, in decisions of the state courts, we are to be governed by the

decisions of the Supreme Court of the United States. In Eastern Building & L. Ass'n v. Williamson, 189 U. S. 122, 23 Sup. Ct. 547, 47 L. Ed. 735 (a case arising in South Carolina and heard upon a writ of error to the Supreme Court of that state), Mr. Justice Brewer quotes with approval the language of the Court of Appeals of New York:

"It is now well settled that a corporation cannot avail itself of the defense of ultra vires when the contract has been, in good faith, fully performed by the other party, and the corporation has had the benefit of the performance and of the contract. As has been said, corporations, like natural persons, have power and capacity to do wrong. They may, in their contracts and dealings, break over the restraints imposed upon them by their charters; and when they do so their exemption * * * cannot be claimed on the mere ground that they have no attributes nor facilities which render it possible for them thus to act. While they have no right to violate their charters, yet they have capacity to do so, and are bound by their acts where a repudiation of them would result in manifest wrong to innocent parties, and especially where the offender alleges its own wrong to avoid a just responsibility. It may be that, while a contract remains unexecuted upon both sides, a corporation is not estopped to say in its defense that it had not the power to make the contract sought to be enforced, yet, when it becomes executed by the other party, it is estopped from asserting its own wrong and cannot be excused from payment upon the plea that the contract was beyond its power."

[9-11] We are of the opinion that the issue of stock as collateral security for the amount advanced upon the faith of such issue was not void. That, if ultra vires all of the stockholders having assented to such issue, and plaintiff having performed his obligations under the contract, and the corporation, having received all of the benefit of such performance, cannot, in behalf of the stockholders, repudiate its action, it is, in equity, estopped from doing so. This is especially true where the plaintiff is not seeking to hold the stock, but offers to surrender it, upon the payment of the amount advanced upon it—thus carrying out in good faith his part of the contract in that respect. The possession of the stock as collateral upon the express provision that he should have the right to vote it at meetings of the stockholders, entitled him, upon the refusal of the other stockholders, to permit him to do so, and the action taken by them, injurious, if not destructive of his rights, to apply to a court of equity for relief and protection. The court thus rightly acquiring jurisdiction was authorized to administer the equities of the parties in accordance with the facts and existing conditions.

The defendant relies upon the well-settled rule that a simple contract creditor having no lien upon, or interest in, the property of the corporations, there being no trust relation, cannot invoke the equitable jurisdiction of the court. It cites Hollins v. Brierfield Coal & Iron Co., 150 U. S. 372, 14 Sup. Ct. 127, 37 L. Ed. 1113. There, the plaintiff was a simple contract creditor, not claiming to have any other relation to the corporation or its property. The principle upon which that and other cases are decided is well settled. The distinction between them and this case lies in the relation in which the plaintiff stood towards the defendant and its property. In regard to the question of jurisdiction, there is another view upon which the action of the court may be sustained. Upon the appeal from the order granting the temporary in-

junction, the question was raised and discussed by the judge in his opinion. If he was in error in that respect, the bill would have been dismissed. While the Court of Appeals, in its opinion, does not refer to the objection that the court was without jurisdiction, the action of the court in taking such jurisdiction and enjoining the defendant from issuing the bonds and executing the mortgage was affirmed. It would seem that the question was foreclosed. It does not appear that any petition to rehear was filed. That this was so regarded by defendants is indicated by its consent to the order of November 8, 1912, appointing a receiver, ordering a reference, calling on other creditors to file their claims, and enjoining all persons from suing defendant corporation. It is true that this order contains these words:

"This order is not to be construed as an adjudication of the rights of the parties as to the issues joined upon the pleadings, further than is hereby expressly ordered."

To this order the attorneys for defendant signed its consent. The only pleadings then before the court was the complaint, answer, replication, cross-bill, and answer; the demurrer had been overruled. This would appear to have been a waiver of the question sought to be raised, in regard to the jurisdiction. That the question should be raised at the earliest stage of the cause is well settled. George Lumber Co. v. Daughtery, 214 Fed. (4th C. C. A.) 958, 131 C. C. A. 254, and cases cited in opinon. It is evident that the District Judge regarded the question as either closed by the decision of the Circuit Court, or waived by the action of defendants. The property has been brought to sale, and the proceeds ready for distribution according to the final decree; the result showing that, in any aspect of the case, the plaintiff is a heavy loser and no possible harm has come to the stockholders. The language of Mr. Justice Brewer in Hollins v. Brierfield Coal & Iron Co., supra, is peculiarly appropriate. Referring to the time and manner of raising the question of jurisdiction for the reasons found here, he says:

"Defenses existing in equity suits may be waived, just as they may in law actions, and, when waived, the cases stand as though the objection never existed. Given a suit in which there is jurisdiction of the parties, in a matter within the general scope of the jurisdiction of the courts of equity, and a decree rendered will be binding, although it may be apparent that defenses existed which, if presented, would have resulted in a decree of dismissal."

Upon a careful consideration of the entire record, and the various assignments of error, we are content with the decree rendered by the learned District Judge.

Affirmed.